IN RE WELFARE OF CHILD NAMED
JAMES AARON CHUESBERG.

233 N. W. 2d 887.

September 12, 1975—No. 45028.

*C. Paul Jones,* State Public Defender, and *Mollie G. Raskind,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

PER CURIAM.

This is an appeal by James Aaron Chuesberg from an order of the Ramsey County District Court, Juvenile Division, adjudging him a delinquent on the ground that he was, at the age of 15, guilty beyond a reasonable doubt of committing murder in the third degree, Minn. St.

609.195. The appeal raises three issues: (1) Whether the juvenile court committed prejudicial error in admitting testimony that the 3-year-old son of the victim, within a short time after the murder, stated that Chuesberg did it; (2) whether there was sufficient evidence to support a finding that beyond a reasonable doubt Chuesberg committed the murder; and (3) whether the state deprived Chuesberg of a fair trial by the proceeding in juvenile court. We affirm.

The victim in this case was Linda Hiler, a 22-year-old mother of two young children and wife of Chuesberg's cousin, Edwin Hiler. Her body was discovered lying in a pool of blood in her residence in the Mc-Donough Project at about 11 p. m. on October 26, 1973, by one Kendall Jones. Jones went to her apartment on instructions from his girl friend, who was a friend of the victim and who lived across the street in the same project. His girl friend had called the victim at approximately 10:45 p. m. and had asked if she could store some meat in the victim's refrigerator because she was defrosting her refrigerator. Jones' mission was to deliver the meat. In response to Jones' knock on the door, the victim's older son, 3-year-old Corky, appeared at the door crying but was unable to open it. Jones then opened the door himself and walked into the living room. There he found the victim, lifeless. Near her on the floor were a blanket and a roll of paper towels. Underneath a paper towel was a steak knife bent at a 90-degree angle.

Jones immediately called the police for an ambulance and called his girl friend and told her to come over. He also answered a telephone call from James Chuesberg's mother, Mrs. Daisy Chuesberg, who also resides in the project. The evidence indicates that the victim had called Mrs. Chuesberg's residence a number of times during the evening to talk with her husband, who was watching television, and with Mrs. Chuesberg, who was returning one of these calls. Jones informed her of what happened and within minutes she arrived, along with the victim's husband, two of his friends, and her son John. The victim's husband, Edwin Hiler, immediately asked 3-year-old Corky who did it and Corky said, "Jimmy did it." In response to the same question by Jones' girl friend, Corky repeated over and over, "Jimmy did it. Jimmy stepped on my ma's face."

In admitting this extrajudicial declaration by the victim's son, the juvenile court stated that it would not rely on this evidence alone but would insist on strong corroborative evidence. Other evidence introduced by the state, which the court could and did consider in adjudging Chuesberg to be delinquent because he was guilty of murder included the following:

(a)  Evidence from which one could reasonably infer that Chuesberg

left his mother's house, which is just a short distance from the victim's house, a short time before the murder was committed. At 10 p. m. the movie that Chuesberg, Edwin Hiler, John Chuesberg, and Mrs. Chuesberg were watching ended. Chuesberg went upstairs shortly thereafter. When his mother, who slept through the movie, awoke sometime after 10, she looked for him upstairs and called out his name but could not find him.

(b) Evidence that at 11:45 p. m. that night Chuesberg arrived at the Norhaven Home (for mentally retarded women), which is three blocks from the McDonough Project, received permission from the night watchman to use the telephone, and made two telephone calls lasting approximately 15 minutes, one of which was to his mother. During one of these calls Chuesberg turned to the night watchman and stated that his cousin had just been stabbed. The night watchman testified that Chuesberg appeared to be in a daze that night.

(c) Evidence that the night watchman at the Norhaven Home discovered shortly after Chuesberg's departure that someone had turned the hose on outside and left the water running.

(d) Evidence that shortly after Chuesberg called his mother, he returned home and that upon his return, he immediately removed his shoes, jacket, and shirt.

(e) Evidence that the shoes which Chuesberg wore that night could have made the mark that was found on the victim's face and could have left the footprints found at the scene.

(f) Evidence that blood found on Chuesberg's shoes and clothing was type A blood, the same type the victim had but not the type of blood Chuesberg has.

(g) Evidence that when the police seized Chuesberg's shoes that night the shoes were soaking wet.

(h) Evidence that police, searching Mrs. Chuesberg's house with her informed consent, found four knives in the kitchen and one in one of the two upstairs' bedrooms which were identical to the knife used to kill the victim.

(i) Evidence that when interrogated, Chuesberg gave a story to police about having been mugged by a group of youths, a story which he later admitted was false.

After the state rested, Chuesberg called a number of witnesses and also testified himself. His testimony was that he had gone to the victim's house, that he entered without knocking, that he found her body on the floor, that he stooped over to pick up the telephone to call the police, that he panicked and decided not to call for help, that he lost his balance and got blood on his hand, that he noticed blood on his shoes

and washed himself off using the water hose at the Norhaven Home, and that he decided to use the Norhaven telephone so that he could tell his mother he was at a friend's house.

In adjudging that Chuesberg was a delinquent child by reason of having committed third-degree murder, the court stated its belief that the evidence of Chuesberg's guilt of that crime was overwhelming.

The juvenile court admitted the testimony concerning the hearsay declarations of the victim's 3-year-old son under the excited-utterance exception to the hearsay rule. We believe that the court did not abuse its discretion in doing so:

(a) The fact that the declaration was made in response to a question does not, as Chuesberg contends, render the declaration inadmissible so long as the utterance was made while the declarant was in an excited state. Van Asch v. Rutili, 286 Minn. 9, 174 N. W. 2d 101 (1970); State v. Gorman, 229 Minn. 524, 40 N. W. 2d 347 (1949); Meyer v. Travelers Ins. Co. 130 Minn. 242, 153 N. W. 523 (1915). This is especially true where, as here, the question is not leading.

(b) The fact that the declaration was not made contemporaneously with the acts which led to the victim's death certainly does not, as Chuesberg contends, render the declaration inadmissible, provided the declaration was made while the declarant was still in an excited state and provided the time interval was not so great as to create a likelihood or opportunity of fabrication. State v. Gorman, *supra*; Clark v. Davis, 153 Minn. 143, 190 N. W. 45 (1922), certiorari denied, 261 U. S. 621, 43 S. Ct. 432, 67 L. ed. 831 (1923).

(c) The fact that the declarant was a bystander and not the victim does not automatically render the declaration inadmissible. However, the fact that a declarant is an uninterested bystander may be considered in determining whether declarant was excited, the theory being that an uninterested bystander is less likely to be excited by an event that does not directly concern him. Here the evidence strongly suggests that the declarant did observe what happened and there is no doubt concerning his interest.

(d) The declarant's possible incompetency to testify at a trial does not render his declaration inadmissible. State v. Brown, 278 Minn. 186, 153 N. W. 2d 229 (1967); State v. Gorman, *supra*.

In summary, an excited utterance is not necessarily rendered inadmissible by the fact that the declaration was made in response to a question, by the fact that it was not made until a short time after the act which caused the excitement, by the fact that the declarant was a bystander, or by the fact that the declarant may have been incompetent to testify at a trial. The key to admissibility is whether the utterance

was spontaneous and excited. In this we are in accord with the new Rules of Evidence for United States Courts and Magistrates. See, Rule 803(2) and Advisory Committee's Note thereto.

The evidence suggests strongly that the utterances by the victim's son were excited utterances. The boy was crying when Jones came to the apartment and within the previous 15 minutes had seen someone violently harm his mother. The probability that he was telling the truth and not fabricating is strong.

This is not to say that such an utterance, standing alone, would be sufficient to sustain an adjudication of delinquency or a conviction. On that we express no opinion. But as our review of the evidence demonstrates, the other evidence of Chuesberg's guilt was overwhelming.

The only other issue raised by Chuesberg, that the state deprived Chuesberg of a fair trial by the proceeding in juvenile court, does not merit discussion.

Affirmed.