STATE of Minnesota, Respondent,

v.

Leonard Ray DANIELS, Appellant.

No. CX–85–249.

Supreme Court of Minnesota.

Jan. 31, 1986.

C. Paul Jones, Minnesota Public Defender, Anne M. Lewis, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

KELLEY, Justice.

Appellant Leonard Ray Daniels is serving a life sentence for first degree murder imposed by the Ramsey County District Court following a jury verdict finding him guilty not only of that charge, but also of two counts of second degree murder of a seven-month old child and one count of arson.[1] On appeal he contends (1) the evidence was insufficient to sustain the guilty finding, (2) the trial court improperly admitted prejudicial hearsay testimony, and (3) the admission of the testimony violated the confrontation rights afforded an accused by the sixth amendment to the United States Constitution and Minn. Const. art. I, § 6. We affirm.

On August 2, 1984 a fire occurred in an apartment on North Grotto Street in St. Paul. At the time, the appellant was living in this apartment with Michelle Merriman and her three children—Willie (age 4), Benjamin (age 3), and Chinesa (age 7 months). In the fire, Chinesa sustained second and third degree burns over 80 percent of her body, and subsequently died. Her death was caused by carbon monoxide poisoning associated with smoke inhalation. Contending that appellant Daniels had intentionally set the fire, the State presented the facts to the grand jury. The grand jury indicted appellant on one count of first degree murder (Minn.Stat. § 609.185, subd. 3 (1984)); two counts of second degree murder (Minn.Stat. § 609.19(1) and (2) (1984)); and on one count of first degree arson (Minn.Stat. § 609.561, subd. 1

---

1. No sentence was imposed on the second degree murder or arson charges. *See* Minn.Stat. § 609.035 (1984).

(1984)) [2]. The petit jury returned guilty verdicts on all charges.

Some time after meeting Michelle in a bar, appellant moved into her apartment, which she shared with her three children, her brother David (23), and her sister, Christine (17). David had some hearing problems and some difficulty in testifying at trial. He did not get along well with Daniels. As the apparent result of this conflict between the two, Michelle had evicted David and Christine from the apartment sometime before the August fire. Before being evicted, and while still living in the apartment, David claims to have overheard a conversation between Michelle and Daniels in which Daniels inquired whether the apartment sprinkler system or fire detector were functional. When she responded negatively, Daniels allegedly told her that if anything accidentally happened to one of her kids they could sue the apartment owner for lots of money so Michelle and her boys could move into a luxury condominium in Minneapolis. In this conversation no mention was made of Chinesa. In fact, David contended that with respect to Chinesa, appellant said, "You don't love that baby anyway because she ain't nothing but a f___ing trick baby." [3]

Michelle, according to David, asked Daniels to do nothing that would harm her kids. A week later, according to David, appellant again said he was "going to take someone out of this family she didn't give a f___ about."

David, as well as other witnesses, testified as to arguments and "fights" between Michelle and Daniels. Michelle had a former boyfriend, Leonard "Steve" Miller. Occasionally, Miller would come by the apartment to see the children or David. Miller apparently considered Chinesa his daughter. Those visits on occasion prompted the arguments and fights between Michelle and Daniels—the last occurring three days before the fire.

On the day of the fire, appellant had spent the afternoon playing cards, gambling, talking, and drinking with Michelle and her friends. Sometime during that afternoon, Miller came to the apartment to see Chinesa. He did not visit her, however, because he saw Michelle and Daniels standing in front of the building, and he did not want to be the cause of another fight wherein Michelle might get hurt again.

Notwithstanding Miller's caution, appellant did in fact see Miller leave the building. Shortly thereafter neighbors heard Daniels and Michelle arguing and heard "a lot of crashing like furniture being tossed around." The neighbors residing across the hall from Michelle's apartment, having been evicted by the owner of the apartment building over a rent dispute, were in the process of moving out. They were Virgil Calamese, his wife, Enola Calamese, and their two children, and Gerald Clifton, his girlfriend, Leonora England, and her three children. While Enola sat watching the children, near the doorway of her apartment, the other three adults were moving boxes out of the apartment.

After Clifton had heard the commotion coming from Michelle's apartment, he observed Michelle leaving to take a walk. Shortly thereafter, appellant Daniels came out of the apartment and asked his neighbors if they had seen his missing television set. Calamese said Daniels, while "ranting and raving," blamed Michelle for the absence of the television set. Daniels then left the building but returned shortly thereafter. He told these neighbors that if anyone came looking for him, they were to say they did not know him and never saw him. Shortly before the fire began, Daniels had told them he didn't care if the building burned and the kids along with it.

---

2. The grand jury also indicted on two counts of attempted second degree murder involving Michelle's two sons. Those counts were subsequently dismissed before trial.

3. Appellant, Michelle, and the two boys were black. Chinesa was light skinned to the extent that the autopsy report describes her as Caucasian. The term "trick baby", according to other witnesses besides David, was used by Daniels derisively to describe what he thought was a "half-breed."

Leonora England observed Daniels throw some unidentified object into his apartment and shut the door. Enola Calamese likewise saw him open his apartment door and move his arm as though he were throwing something into the apartment, although she did not see any object being thrown. Right after this movement, however, she did hear Daniels say, "If anything happens to those f___ing kids, I don't know nothing about it." Then Daniels again left the building.

Upon hearing some children outside the building yelling "fire," Clifton ran out to see what apartment was on fire. He saw Daniels come around the corner from Hague and Grotto, lean against the building next to the apartment, and heard him say, "Ha-ha, you all look, it's burning, it's burning." A few seconds later, in an apparent change of heart, Daniels tried to enter the apartment but was turned back by the flames. He and Clifton did run to the rear of the building, and by climbing on a rubbage dumpster, they were able to reach the window to the bedroom where Michelle's two boys were. Daniels severely cut his arm in smashing the window open. He did, however, aid Clifton and Anthony Thorp (Michelle's cousin), in rescuing the two boys from the room.

Meanwhile inside the building, Calamese, with the aid of another person, was able to enter the burning apartment by using water, towels and sheets. He smelled gas in the apartment and attempted to shut off the gas valve. He did break into the bedroom where the two boys were, but they were being taken out so he crawled back out of the apartment.

Shortly afterwards, firefighters responded to the fire call. After the flames in the apartment had been extinguished, they entered the building and found a badly burned lifeless baby behind a bed tilted against the wall.

At trial, the State's case against Daniels proceeded on two theories. The first was that in a jealous rage he had intentionally set the fire resulting in the death of seven-month old Chinesa. The second was that appellant and Michelle conspired to set the fire, kill the child, and collect damages from the landlord.

With respect to the arson claim, the State presented photographs of char patterns on the apartment floor, which, in the opinion of Arson Investigator James Syvertsen, indicated that an accelerant was used to ignite the fire. An analyst from the Minnesota Bureau of Criminal Apprehension testified that gas chromatography testing of some samples and swabs of flooring collected from the apartment revealed the presence of a middle petroleum distillate consistent with mineral spirits. In the basement of the apartment building were middle petroleum distillates consistent with the positive chromatogram for mineral spirits. The State likewise introduced a key removed from appellant's trousers. This key fit the basement door lock where the cans of flammable liquid were found. Appellant had access to the room and the accelerant because he was a caretaker for the apartment building. Evidence was also presented that after the fire, appellant's clothing and his television were found in the hallway outside the back door of Michelle's apartment and, accordingly, had not been burned in the fire.

With respect to the conspiracy claim, the State introduced evidence through Michelle's brother, David, of the conversations wherein Daniels had suggested a fire and the killing of Chinesa to be followed by a large claim for damages against the landlord for failure to maintain smoke detectors and sprinkling systems. In attempted corroboration of that theory, the State introduced evidence that Michelle, the day after the fire, had told police officers that the smoke detectors and the sprinkler system did not work, that the landlord was responsible for the baby's death, and that she would sue him. In fact, there was testimony that Michelle on that day hired a lawyer to do so.

I. Sufficiency of the Evidence.

■ Appellant contends the evidence was insufficient to sustain the conviction. In examining such a claim, we examine the

evidence by viewing it in the light most favorable to the verdict. *State v. Jones*, 347 N.W.2d 796 (Minn.1984); *State v. Oevering*, 268 N.W.2d 68 (Minn.1978). The weight and credibility to be given to the testimony of individual witnesses is within the province of the jury. *State v. Engholm*, 290 N.W.2d 780 (Minn.1980).

If the hearsay statements of Michelle's two boys, the only direct witnesses to the fire, are inadmissible (discussed, *infra*, in Section 2), appellant's conviction rests on circumstantial evidence. In such a case reasonable inferences from the evidence must be consistent not only with the accused's guilt, but inconsistent with any rational hypothesis except that of guilt. *State v. Threinen*, 328 N.W.2d 154 (Minn. 1983); *State v. Wahlberg*, 296 N.W.2d 408 (Minn.1980). Nevertheless, a jury is in the best position to evaluate circumstantial evidence and its verdict is entitled to due deference by an appellate court. *State v. Linder*, 304 N.W.2d 902 (Minn.1981).

The evidence supporting a finding of arson included photographs of unusual, irregular char patterns; gas chromatograms of floor samples showing the presence of mineral spirits, an accelerant; gas chromatograms on liquids found in three cans in the basement, all consistent with mineral spirits; testimony on furniture piled in the center of the living room and the smell of gas; and, the unexplained placement of the television set and clothing outside the apartment. Appellant does not challenge this evidence.

Evidence linking Daniels to the fire includes testimony by neighbors placing Daniels in the apartment minutes before the fire and testimony on his access to Michelle's apartment and the basement storeroom where flammable liquids were stored. For a possible other suspect, defendant offers only his unsubstantiated allegation about a man wearing a brown cap allegedly seen near the apartment building at about the time of the fire.

Appellant claims his conviction was entirely circumstantial because no one saw

him start the fire.[4] The four adult neighbors who were moving out provided perhaps the most incriminating evidence. Although the wording was not exactly the same, each quoted Daniels as saying minutes before the fire, he didn't care if the building burned and the children along with it. He also told the neighbors to deny they knew or saw him. Two witnesses saw Daniels make a throwing gesture into his apartment before shutting the door. The next time the door was opened, the apartment was in flames. Clifton testified Daniels laughed about the building burning seconds before he ran to help rescue the children. Appellant suggests the neighbors had a motive to lie because he was the building's caretaker and they were being evicted. At trial, however, the neighbors said their eviction involved a dispute over rent with the landlord and had nothing to do with the caretaker. In an attempt to counteract this overwhelming evidence, appellant suggested the fire was started by 3½ year old Ben smoking and igniting such a rapid burning fire. Finally there was the fact that the door to Willie and Ben's bedroom was closed by appellant whereas normally it was left open because the boys could not open it when it was shut.

The State suggested that appellant had a financial gain motive to intentionally set this fire. This theory rested substantially on the testimony of David Merriman and statements made by Michelle. Although conceding that David may have limited intelligence, was deaf in one ear, and may have had a motive to falsify testimony, the State argues it is unlikely that a person of David's intelligence could concoct a plot to set the fire and sue the landlord—a plot that implicated his own sister. Although appellant contends David was a totally unreliable witness, the weighing of credibility is a jury function. *See, e.g., Engholm*, 290 N.W.2d at 784.

The State likewise advanced the theory that the fatal fire was set in a rage of jealousy over Michelle's relationship with

---

4. Michelle's two sons were apparently eyewitnesses. *See* discussion, *infra*, in Section 2.

Miller. Angella Reese testified that Daniels objected to Miller's visits. Miller testified he avoided going to Michelle's apartment the day of the fire because "he didn't want Ray getting mad at Michelle." Clifton heard Daniels arguing with Michelle and a great commotion in their apartment just before she left the apartment and shortly before the fire was started. Virgil Calamese testified Daniels was "ranting and raving." Moreover, Daniels made no secret that he had little use for Chinesa. He suspected she might be Miller's child or a "half-breed." Reviewing the evidence as a whole, it leads directly to the guilt of the appellant. Even without the hearsay testimony of Michelle and her sons, the reasonable inferences from the remaining evidence are consistent only with Daniels' guilt and inconsistent with any rational hypotheses except that of guilt. *See Threinen,* 328 N.W.2d at 156.

## II. Testimony of Willie and Ben Merriman.

■ Chinesa and Ben were taken from the fire scene to St. Paul Ramsey Medical Center in an ambulance. Although not physically injured, Ben was covered with blood apparently from the severe cut appellant had on his arm from breaking the window. Angella Reese and Michelle followed in a police car. After being checked for injuries, Ben sat in Reese's lap in the waiting room. He was shaking. Reese asked, "Do you want to tell me what happened?" Ben answered, "Ray started the fire. Ray started that fire with milk and put us into the bedroom."[5] Dewanda Johnson, another person in the room, confirmed this conversation.

Within an hour of the fire, Margaret Merriman, Michelle's sister, talked with Willie Merriman as they walked half a block up Grotto toward Dayton Street. She described her nephew as frightened and asked him who started the fire. He

responded, "Ray did it. Ray did it." She did not press him further.

The trial court allowed Reese, Johnson, and Margaret Merriman to testify about the statements made by Willie and Ben under the excited utterance exception to the hearsay rule. Minn.R.Evid. 803(2)[6] Appellant argues the statements of the boys were not excited utterances and, therefore, that the trial court erred. The Minn.R.Evid. 803(2) Advisory Committee comment (1977) states:

> The excited utterance exception is one which traditionally has been treated in terms of "res gestae" in Minnesota. * *
>
> In order to qualify as an excited utterance, the following three requirements must be met:
>
> 1. there must be a startling event or condition;
>
> 2. the statement must relate to the startling event or condition; and
>
> 3. the declarant must be under a sufficient aura of excitement caused by the event or condition to insure the trustworthiness of the statement.

The rationale stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement. As the time lapse between the startling event and subsequent statement increases so does the possibility for reflection and conscious fabrication. There can be no fixed guidelines. It is largely a matter for the trial judge to determine whether the statement was given at such a time when the aura of excitement was sufficient to insure a trustworthy statement. Rule 104(a). In reaching this decision the judge must consider all relevant factors including the length of time elapsed, the nature of the event, the physical condi-

---

**5.** The State interpreted "milk" as meaning a milk-like accelerant consisting of the middle distillates from the basement.

**6.** An exception to the hearsay rule is an "excited utterance" defined in Minn.R.Evid. 803(2) as:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

tion of the declarant, any possible motive to falsify, etc.

The trial court considered the three requirements and other relevant factors before admitting the statements as excited utterances. The children's statements, the court noted, related to the startling event of being trapped in a room while a fire was burning. The court further noted the statements were made "a relatively short time" after the fire, to an aunt and close family friend. Finally, the court could find no motive for the children to falsify.

Appellant contends the children's statements that "Ray set the fire" were inadmissible because they were made up an hour or so after the fire and therefore not contemporaneous with the startling event. He further argues the utterances were not made at or near the scene of the fire, nor were they spontaneous because they came in response to leading questions.

The State maintains the requirements for an excited utterance exception were met because the children were both under the aura of excitement caused by the fire to such an extent as to insure the trustworthiness of their statements. Ben, then 3 years, 10 months, had been covered with blood and was shaking in a hospital waiting room after being rescued from a smoky apartment and transported by ambulance from the fire scene. Willie's aunt described him as frightened when he told her, "Ray did it." He made the statement while walking with his aunt half a block from his home within an hour after the fire. The State further asserts the questions to the children (What happened? Who set the fire?) from a close family friend and relatives were not leading.

Lapse of time between the startling event and the excited utterance is not always determinative. *See* Rule 803 comment, *supra.* For example, this court in *State v. Berrisford,* 361 N.W.2d 846 (Minn.

1985) has recently ruled a statement made 90 minutes after a murder was admissible under this hearsay rule exception.[7]

■ Appellant likewise argues the boys' statements were untrustworthy and unreliable because they were made by children ruled by the court incompetent to testify in person at the trial and repeated by adults who felt animosity toward him.[8] Incompetency to testify in itself is not a bar to admission of "res gestae" statements. *See State v. Gorman,* 229 Minn. 524, 40 N.W.2d 347 (1949) (res gestae utterance by boy, almost 4, admissible); *State v. Brown,* 278 Minn. 186, 153 N.W.2d 229 (1967) (res gestae statements by mentally retarded declarant ruled incompetent to testify, properly received). In one case, we held admissible the statement of a 3–year old witness to a murder. *In re Welfare of Chuesburg,* 305 Minn. 543, 233 N.W.2d 887 (1975). In that case, the child had responded, "Jimmy did it" when questioned by his father. *Id.* at 544, 233 N.W.2d at 888. In *Chuesburg* we recapitulated our rulings as follows:

> In summary, an excited utterance is not necessarily rendered inadmissible by the fact that the declaration was made in response to a question, by the fact that it was not made until a short time after the act which caused the excitement, by the fact that the declarant was a bystander, or by the fact that the declarant may have been incompetent to testify at a trial. The key to admissibility is whether the utterance was spontaneous and excited.

*Id.* at 546–47, 233 N.W.2d at 889.

From all the circumstances existing on the day of the fire, it appears clear to us there was no abuse of discretion in admitting the boys' statements as excited utterances. Each boy made the same statement at approximately the same time while separated from each other. The questions they

---

7. Depending on all the circumstances, we have on occasion ruled the exception is inapplicable when shorter periods of time between the event and the utterance have elapsed. *See, e.g., State v. Taylor,* 258 N.W.2d 615 (Minn.1977).

8. In a pre-trial ruling, the judge held the two boys were incompetent to testify after questioning them. The children were developmentally delayed and received special schooling. They did have difficulty in communicating.

responded to were not leading. Neither appeared to have had the time nor the motive to fabricate the story. The evidence corroborating their statements is strong. The trial judge properly considered the relevant factors under Minn.R. Evid. 803(2).

III. Michelle Merriman's Statements.

At the fire scene before going to the hospital, Michelle told a police officer that Steve Miller, her former boyfriend, was mean and would set a fire to hurt her kids. She also said Ray Daniels loved her and the kids and would never do this type of thing. The following day she denied making this statement when interviewed by another officer, Paul Benson. Over objection, Benson testified about her denial. Likewise, he testified she told him that the smoke detectors and sprinkler system did not work, the landlord was responsible for her baby's death, and she would sue him. In addition, there was testimony from Angella Reese that Michelle had retained a lawyer on the day following the fire to represent her in collecting damages.

In pre-trial proceedings, Michelle informed the court that she would exercise her fifth amendment right not to testify on the grounds her testimony might incriminate her. The trial judge found a factual basis existed for her to exercise that constitutional right, and, in fact, she did not testify at the trial. However, the trial judge admitted Michelle's statements through the testimony of Officer Benson and Angella Reese on the ground that there had been a prima facie showing of a conspiracy between Michelle and Daniels, and that these statements of a coconspirator were admissible under the coconspirator exclusion to the hearsay rule. Minn.R. Evid. 801(d)(2)(E).[9] The trial court relied on *State v. Thompson*, 273 Minn. 1, 139 N.W.2d 490, *cert. denied sub nom. Thomp-*

son v. Minnesota, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966), where we said:

The responsibility for determining whether a conspiracy has been sufficiently established to admit hearsay statements of co-conspirators rests in the first instance with the trial court.

* * * The existence of a conspiracy may not be proved by the hearsay statements of the alleged coconspirators, and ordinarily such statements should not be admitted until a prima facie showing of the existence of a conspiracy is made, but some latitude must be allowed the trial court in determining the order of proof. * * *

Where an examination of the record as a whole shows facts from which the trial court could reasonably infer the existence of a conspiracy, the case ought not to be reversed because proof of the conspiracy came at the wrong time. * * *

* * * The term 'prima facie' in this context is rather a nebulous one that defies exact definition. It can probably be defined only in terms of sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy.

*Id.* 273 Minn. at 16–17, 139 N.W.2d at 503 (citations omitted). Appellant contends David Merriman's testimony was insufficient to establish a prima facie case of conspiracy. This court had occasion to discuss the independent evidence of conspiracy requirement in *State v. Black*, 291 N.W.2d 208 (Minn.1980):

Independent evidence need only be sufficient to make a prima facie showing of the existence of the conspiracy to allow in statements of co-conspirators. * * * It is not necessary that the evidentiary conspiracy be established by direct evidence; it must often be proved inferen-

---

**9.** Insofar as applicable, Minn.R.Evid. 801(d)(2)(E) reads as follows:

(d) * * * A statement is not hearsay if—
   *   *   *   *   *   *
(2) * * * The statement is offered against a party and is * * *

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

tially and circumstantially because of the very nature of a conspiracy.

*Id.* at 216 (citations omitted).

█ In this case the evidence was sufficient to make a prima facie showing from which the trial court could reasonably infer the existence of a conspiracy. There were (1) the statements of David Merriman; (2) Michelle's statement her baby was burning when, in fact, all three of her children were trapped inside the apartment; (3) a fire report that batteries were missing from the smoke alarms in the apartment building; (4) Michelle's statements to a police officer the day of the fire suggesting Miller may have set the fire and exonerating Daniels; and (5) her actions the following day in telling Officer Benson that she intended to sue the landlord and then consulting a lawyer toward that end. These latter actions on her part were in conformance with the conversation between herself and Daniels overheard and reported by David Merriman. We find no abuse of trial court discretion in concluding sufficient independent evidence existed to establish a prima facie conspiracy.

### IV. Appellant's Claimed Confrontation Rights.

Appellant Daniels maintains that even if the statements of the two boys are admissible under the excited utterance exception to the hearsay rule, or even if their mother's statements were admissible under the conspiracy exclusion from the hearsay rule, his constitutional right to confront witnesses against him was violated. U.S.Const. amend. VI; Minn. Const. art. I, § 6.

█ Even though out of court statements may be admissible under an exception to or exclusion from the hearsay rule, the statements will be excluded by the court if the constitutional confrontational rights of the accused are violated. *Ohio v.*

*Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *State v. Hansen,* 312 N.W.2d 96 (Minn.1981).

█ In *Hansen,* in determining that an accused's confrontational rights had been violated, we applied the two-step analysis suggested by the Supreme Court of the United States in *Roberts* to determine whether application of a hearsay exception violates the accused's constitutional confrontational right. There we indicated the trial court must first address the necessity of the admission of the hearsay declaration. This requirement can usually be met by showing the declarant is unavailable to testify at the trial. In this case the necessity was shown. Michelle, like the declarants in *Hansen,* was unavailable on the basis of her exercise of her fifth amendment privilege to not testify, and the Merriman boys were unavailable for cross-examination because the court had ruled them incompetent to testify.

The second *Hansen* requirement—a demonstration the statements bear sufficient "indicia of reliability" to avoid conflict with the confrontation clause—is here easily met when examining the statements of the two Merriman boys. In *Roberts,* the Supreme Court of the United States said, "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." 448 U.S. at 66, 100 S.Ct. at 2539. The excited utterance exception (formerly sometimes referred to as "res gestae") has a long history in the law. *See, e.g., State v. Alton,* 105 Minn. 410, 117 N.W. 617 (1908); *State v. Williams,* 96 Minn. 351, 105 N.W. 265 (1905). The individual statements by each of the Merriman boys were made under such circumstances as to establish a high degree of circumstantial probability of trustworthiness.[10] Therefore, we hold the excited utterance of the Merriman boys

---

10. In neither *State v. Gorman,* 229 Minn. 524, 40 N.W.2d 347 (1949) nor in *In re Welfare of Chuesburg,* 305 Minn. 543, 233 N.W.2d 887 (1975), two of our leading cases involving incompetent child declarants, was the confrontation issue addressed. *Compare McLaughlin v. Vinzant,* 522 F.2d 448 (1st Cir.), *cert. denied,* 423

U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975) (excited utterance withstood confrontation cause challenge) *with State v. Butcher,* 120 Ariz. 234, 585 P.2d 254 (Ariz.App.1978) (victim's out-of-court statements, though properly falling within the excited utterance exception to the hearsay rule, had insufficient other indicia of

were not in violation of the confrontational clause, and were properly admitted by the trial court.

■ Unlike the statement of the two boys, Michelle Merriman's statements were not within a "firmly rooted hearsay exception." Rather, her statements, admitted in court through the testimony of Officer Benson, came within the coconspirator exclusion from the bar of the hearsay rule. Even though not within a "firmly rooted hearsay exception," Michelle's statements may nevertheless be admissible without violating the confrontation clause. Clearly, the first requirement of *Hansen*, the establishment of a necessity for the evidence, has been met. She had exercised her fifth amendment right and was therefore unavailable to testify and to be cross-examined. However, the statements of a coconspirator do not have the same guarantees of trustworthiness as some well-rooted hearsay exceptions. Rather, the coconspirator exclusion arises not from evidentiary rules but rather from the fiction of agency in rules concerning the law of conspiracy. *See, e.g.* Note, *Reconciling the Conflict Between the Coconspirator Exemption from the Hearsay Rule and the Confrontation Clause of the Sixth Amendment,* 85 Colum.L.Rev. 1294, 1300 (1985). Nevertheless, the courts seem to treat the coconspirator's exclusion from the hearsay rule the same as the *Roberts* enunciated "firmly rooted exception" requirement. *See, e.g.,* Note, *Federal Rule of Evidence 801(d)(2)(E) and the Confrontation Clause: Closing the Window of Admissi-*

*bility for Coconspirator Hearsay,* 53 Fordham L.Rev. 1291 (1985).

With respect to whether the coconspirator exclusion is "firmly rooted", most courts appear to examine its longevity. *See, e.g., United States v. McLernon,* 746 F.2d 1098, 1106 (6th Cir.1984); *United States v. Chappell,* 698 F.2d 308, 312 (7th Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Lurz,* 666 F.2d 69, 80–81 (4th Cir.1981), *cert. denied sub nom. Magill v. United States,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982); *United States v. Bruner,* 657 F.2d 1278, 1285 (D.C.Cir.1981); *United States v. Peacock,* 654 F.2d 339, 349 (5th Cir.1981), *cert. denied sub nom. Peacock v. United States,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983). Some commentators have criticized reliance on longevity to determine whether the exclusion is "firmly rooted." *See, e.g.,* Note, *supra,* 53 Fordham L.Rev. at 1310–11.

In Minnesota the coconspirator exclusion dates back to at least 1918. *State v. Dunn,* 140 Minn. 308, 168 N.W. 2 (1918). Moreover, like most of the federal circuit courts which have considered the issue, we have upheld the admission of statements by a coconspirator in criminal cases against confrontation clause challenges. *See State v. Daniels,* 361 N.W.2d 819, 830–31 (Minn. 1985); *State v. Davis,* 301 N.W.2d 556, 559 (Minn.1981).[11]

■ Had the statement of Michelle given to Officer Benson the day after the fire been crucial to the prosecution's case against appellant, the admission might

reliability to be admitted against a confrontation clause challenge).

**11.** It has been· argued that statements of coconspirators should not be admitted against a claim of violation of the confrontation clause because they are "inherently unreliable" unless the declarant is unavailable and the evidence is not crucial to the prosecution's case. *See* 53 Fordham L.Rev. 1291 (1985). *See also State v. Hansen,* 312 N.W.2d 96 (Minn.1981). In *Hansen* the trial court permitted the prosecution to introduce a statement of a witness who had exercised fifth amendment rights on the ground the statement came under the hearsay exception of statement against penal interest. In reversing based upon the particular facts and circumstances

there existing, we held that the witness statements did not bear "sufficient indicia of reliability" and that admission of the disputed statement in evidence was violative of the accused's right of confrontation. *Hansen* is not precisely in point because it was concerned with the statement against penal interest exception to the hearsay rule. Nevertheless, it appears the rationale justifying the coconspirator exclusion is, in part at least, based upon a somewhat analogous reasoning—to wit, that each conspirator is deemed to have consented to those acts of a coconspirator to promote the common objective. The statement of a coconspirator is a verbal act, and therefore admissible. *See, e.g.,* Note, *supra,* 85 Colum.L.Rev. at 1307–11.

have violated his confrontation rights. The admission of declarations which are not crucial to a case is less likely to involve a denial of defendant's confrontation right. *Hansen*, 312 N.W.2d at 102. It appears clear to us, however, that the statement was not crucial. The State's case against Daniels was overwhelming and as unerringly as can happen in a case of this kind, pointed to him as the culprit. In Michelle's conversation with Benson, she merely retracted an alleged statement she had made the day of the fire that "Ray would never do this type of thing." At best, the alleged statement made at the scene was the statement of opinion; the statement made the next day to Benson was merely a retraction of that previously uttered opinion and was merely corroborative. Thus, we find no constitutional error. Finally, even should admission of the statement through Officer Benson be deemed constitutional error, in view of the overwhelming evidence pointing to appellant's guilt, the error, if any, is harmless beyond a reasonable doubt. A reversal is not required if the court finds the remaining evidence is overwhelmingly persuasive of defendant's guilt. *State v. Shotley*, 305 Minn. 384, 387, 233 N.W.2d 755, 758 (1975).

Affirmed.