STATE of Minnesota, Respondent,

v.

Steven DeWayne JENKINS, Appellant.

No. C3–86–1902.

Court of Appeals of Minnesota.

Aug. 18, 1987.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Sp. Asst. Atty. Gen., St. Paul, Stephen C. Rathke, Crow Wing Co. Atty., Brainerd, for respondent.

Robert J. Zohlmann, Minneapolis, for appellant.

Heard, considered and decided by FOLEY, P.J., and FORSBERG and CRIPPEN, JJ.

## OPINION

FOLEY, Judge.

Steven Dewayne Jenkins appeals from a judgment of conviction for aiding and abetting the sale of a Schedule II controlled substance (cocaine) in violation of Minn. Stat. § 152.09, subd. 1(1) (1986) and Minn. Stat. § 152.15, subd. 1(2) (1986) (Count I) and conspiracy to possess with intent to sell a Schedule I controlled substance (marijuana) in violation of Minn.Stat. § 152.096 (1986) (Count II).

On appeal, Jenkins contends that: (1) the trial court used an improper standard of proof to convict him; (2) the evidence was insufficient to support a finding of conspiracy and that the substance involved in the attempted sale was cocaine as defined by Minn.Stat. § 152.02, subd. 3(1)(d) (1986); and (3) his right to confrontation was violated by the admission of a co-conspirator's statements. We affirm.

## FACTS

On January 30, 1986, at approximately 1:30 a.m., undercover narcotics agent J. Bruce Preece waited in a parking lot for Patrick Hoelscher and a friend to conduct a prearranged drug sale. Hoelscher arrived at the designated meeting point in a car he subsequently identified as being driven by appellant Steven Jenkins. Hoelscher approached Preece and offered to sell him a half ounce of cocaine that "they" had for $2550. According to Preece's testimony, Hoelscher also stated that his friend was interested in purchasing some marijuana. Preece told Hoelscher to follow him to a nearby motel to complete the drug transaction and Hoelscher and Jenkins complied.

Hoelscher and Jenkins followed Preece into the motel room and were met by another undercover agent, Eugene Leatherman. A 50–pound bale of marijuana wrapped in burlap and paper was on the floor. Jenkins visually inspected the marijuana, commenting on the size and smell of the bale, and asked for a price. Preece then asked Jenkins for a quantity of desired purchase and Jenkins responded that he was interested in purchasing 15 pounds. Preece told Jenkins that the price per pound on a 15–pound purchase would be $500. No agreement concerning the marijuana was finalized and no money transferred hands.

When Preece asked to see the cocaine, Hoelscher pulled a baggie of white powder out of his pocket and gave it to Preece. According to Preece, when he asked about the quality of the substance, Jenkins replied that it had "a lot of rock," meaning that it had not been cut up with a derivative and made less potent. Preece further testified that Jenkins told him that he and Hoelscher had originally tried to purchase methamphetamines but because the price was too high, they bought cocaine instead. Hoelscher and Jenkins were arrested after Hoelscher suggested sampling the powdered substance. The entire episode in the motel room lasted three to four minutes.

Hoelscher did not testify at Jenkins' court trial. When the prosecutor sought to introduce Hoelscher's out-of-court statements, defense counsel objected on hearsay grounds. The prosecutor explained that his office had subpoenaed Hoelscher but was unable to locate him until the day before trial, that Hoelscher was confined to a hospital under doctor's orders, and that Preece's attempts to reach Hoelscher's doctor went unanswered. The court sustained the objection, stating that "no conspiracy [has been] established yet." Defense counsel renewed his hearsay objection when Preece was asked to relate the conversations and activities that took place in the motel room, claiming that admission of Hoelscher's statements would violate Jenkins' constitutional right to confrontation.

The trial court overruled the objection, stating:

> I consider that the overt act of [Jenkins] walking into a room where the companion had been told that 50 pounds of marijuana would be present and staying there is sufficient to establish the conspiracy for purposes of hearsay.

Betty Rogers, a forensic chemist for the Bureau of Criminal Apprehension, testified that she performed the customary visual, color, gas chromatograph and mass spectometer tests on the powdered substance and believed that the substance was cocaine. She also performed a melting point test on the sample to determine whether the cocaine was natural (1–cocaine) or synthetic (d-cocaine). Only 1–cocaine is covered as a Schedule II controlled substance under Minn.Stat. § 152.02, subd. 3(1)(d) (1986). Rogers concluded that the substance had been derived from coca leaves and was 1–cocaine. Rogers also stated that bottles labeled "manitol" and "inositol" found in Jenkins' car were commonly used as cutting agents for cocaine and other drugs. However, she admitted that she did not analyze the bottles to confirm their properties.

During cross-examination, Rogers acknowledged that the subject sample could have derived from a plant species other than coca leaves and further that she had not compared the subject sample with coca leaves, but rather with a standard laboratory sample known to be cocaine. However, on redirect, Rogers explained that although she could not specifically identify the subject sample as cocaine derived from coca leaves, she could say with certainty that the substance had the same chemical properties and was chemically identical to cocaine derived from coca leaves.

The trial court found Jenkins guilty of Counts I and II and judgment was entered. This appeal followed.

## ISSUES

1. Was Jenkins' conviction properly based on a finding that he was guilty of the charged offenses beyond a reasonable doubt?

2. Does the evidence support the trial court's conclusion that Jenkins was guilty of conspiracy to sell a controlled substance?

3. Does the evidence support the trial court's conclusion that subject substance was a Schedule II controlled substance as defined by Minn.Stat. § 152.02, subd. 3(1)(d) (1986)?

4. Did the trial court violate Jenkins' right to confrontation by admitting statements made by his companion during the attempted sale only after it was satisfied that a prima facie showing of a conspiracy had been made by the prosecution?

## ANALYSIS

■ 1. Jenkins claims that the trial court erred by requiring only clear and convincing evidence of his guilt, rather than the axiomatic standard of guilt beyond a reasonable doubt. This claim is meritless.

The only reference to "clear and convincing" evidence was the trial court's description of the testimony in the first sentence of its memorandum: "Defendant offered no testimony and so I am left with only the State's evidence which was undisputed, unimpeached, and clear and convincing." Subsequently, in the same memorandum, the trial court stated it "had no trouble whatever finding that the State had proven the elements discussed *beyond a reasonable doubt.*" (Emphasis supplied.)

Moreover, in explaining the consequences of Jenkins' waiver of a jury trial, the trial court stated in pertinent part:

> "Naturally, I am going to require the quantum of proof that the law says must be there, *it has to be beyond a reasonable doubt and I certainly intend to employ the presumption of innocence.*"

(Emphasis supplied).

In *State v. Ayers,* 303 Minn. 562, 228 N.W.2d 547 (Minn.1975), the supreme court held that the trial court's use of the phrase "clear and convincing" in referring to the complainant's testimony was harmless

when it was evident from the record that the trial court had properly applied the proof beyond a reasonable doubt standard in finding the defendant guilty. This case is essentially identical to *Ayers.*

■ 2. Jenkins next contends that the evidence was insufficient to support his conviction for conspiracy to sell a controlled substance. It is well established that the findings of a trial court, after waiver of a jury trial, are entitled to the same weight as a jury verdict. *State v. Bouwman,* 354 N.W.2d 1, 4 (Minn.1984); *State v. Vail,* 274 N.W.2d 127, 133 (Minn. 1979). Moreover, it is not relevant whether an appellate court would draw the same conclusion from the evidence; the findings will not be set aside unless clearly erroneous. *Vail,* 274 N.W.2d at 133.

Minn.Stat. § 152.096 (1986) provides in part that "[a]ny person who conspires to commit any act prohibited by section 152.09 * * * is guilty of a felony."[1] Conspiracy requires a collective criminal agreement and an overt act by any one of the conspirators in furtherance of the agreement. Minn.Stat. § 609.175, subd. 2 (1986); *State v. Olkon,* 299 N.W.2d 89, 104 (Minn.1980), *cert. denied sub nom., Olkon v. Minnesota,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981); *State v. Evans,* 347 N.W.2d 813, 817 (Minn.Ct.App.1984), *pet. for rev. denied,* (Minn. July 26, 1984).

■ Jenkins contends that the absence of evidence establishing a conversation between himself and Preece prior to entering the motel room, an exchange of money for the marijuana or a definite agreement concerning price compels a reversal of his conspiracy conviction. We disagree.

Preece observed Jenkins as the driver of the vehicle that delivered Hoelscher to the prearranged meeting place. Further, both Jenkins and Hoelscher followed Preece into the motel room to complete the transaction, including the purchase of marijuana. The evidence further supports the finding that, while in the motel room, Jenkins expressed an interest in purchasing 15 pounds of marijuana. The facts and reasonable inferences flowing therefrom support the trial court's finding of conspiracy to possess marijuana.

Everything said, written, or done by a conspirator in execution or furtherance of the common purpose to commit a crime is deemed to be the act of every party to the conspiracy, whether present or absent, and is admissible as evidence against each of them. The combination need not be established by direct proof. *No formal agreement to commit the acts charged need be shown. The existence of the combination or conspiracy may be inferred from other facts proved. If the other facts proved show that the defendants, by their acts, pursued the same object, often by the same means, one performing one part and another another part of the same so as to accomplish a common purpose, the existence of the conspiracy is one of fact.* *State v. Kahner,* 217 Minn. 574, 581, 15 N.W.2d 105, 109, *cert. denied sub nom., Kahner v. Minnesota,* 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614 (1944) (emphasis supplied).

Moreover, the evidence was sufficient to support a finding of conspiracy to sell the marijuana if the purchase had been completed. As the trial court stated: "One would be a fool to conclude that Jenkins and Hoelscher intended to buy 15 pounds of marijuana from the 50 pound bale for their own use." *See State v. White,* 332 N.W.2d 910, 912 (Minn.1983) (intent to sell a controlled substance may be inferred from the quantity and packaging of a drug).

■ 3. Jenkins additionally asserts that the evidence was insufficient to prove that the powdered white substance given to Preece was a prohibited Schedule II controlled substance under Minn.Stat. § 152.-02, subd. 3(1)(d). In relevant part, this

---

1. Jenkins was charged under Minn.Stat. § 152.-09, subd. 1(1) (1986), which provides that it is unlawful for a person to "[m]anufacture, sell, give away, barter, deliver, exchange or distrib- ute; or possess with intent to manufacture, sell, give away, barter, deliver, exchange or distribute, a controlled substance."

statute defines Schedule II controlled substances:

(1) Unless specifically excepted or unless listed in another schedule, any of the following substances *whether produced directly or indirectly by extraction from substances of vegetable origin* or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

\* \* \* \* \* \*

(d) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation *thereof* which is chemically equivalent or identical with any of these substances \* \* \*.

Minn.Stat. § 152.02, subd. 3(1)(d) (emphasis supplied).

Jenkins argues that the word "thereof" modifies coca leaves, requiring that 1–cocaine must derive only from "[c]oca leaves and any salt, compound, derivative or preparation of coca leaves." Since BCA chemist Rogers could not identify the subject substance as a derivation of coca leaves, he claims that conviction under Count I must be reversed.

The trial court agreed that use of "thereof" in the statute was confusing and at first appeared to modify coca leaves or, more plausibly, "a second step derivation of coca leaves." However, this explanation was rejected: "The problem with this construction is that \* \* \* there is really no need for the second clause at all because a derivation is a derivation whether it is achieved in two steps or one step."

The trial court concluded that the only sensible construction of section 152.02, subd. 3(1)(d)

is that the Legislature intended to include as a prohibited controlled substance, any derivative or preparation *of any* salt or compound *of any* plant or vegetable so long as the final result is chemically equivalent or identical with coca leaves or any salt, compound, derivative or preparation of coca leaves. Considering the quoted prefatory language of (1), I am satisfied that 1–cocaine is a controlled substance under § 152.02,

Subd. 3(1)(d), whether it comes from coca leaves or some other plant *so long as it is chemically equivalent or identical with coca leaves or any derivative thereof.*

(Emphasis supplied.) We agree with the trial court's analysis. Rogers testified that the subject substance was 1–cocaine derived from either coca leaves or some other plant within the species. Thus, the substance was unquestionably of "vegetable origin," satisfying the preliminary requirements of section 152.02, subd. 3(1). Moreover, Rogers explained, *without contradictory testimony*, that the subject substance was "chemically equivalent" or identical to 1–cocaine derived from coca leaves. We will not engage in a battle over semantics when *uncontradicted* expert testimony establishes that the subject substance was "chemically equivalent" to cocaine.

■ 4. Jenkins lastly argues that admission of Hoelscher's hearsay statements violated the hearsay rule and his constitutional right to confrontation of witnesses.

Minn.R.Evid. 801(d) defines statements which are *not* hearsay, including in pertinent part when:

(2) \* \* \* The statement is offered against a party and is \* \* \*

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Minn.R.Evid. 801(d)(2)(E).

Application of this rule is available only if the prosecution lays a foundation for admission of the statements by independent prima facie proof. *State v. Scanlon,* 268 N.W.2d 63, 64 (Minn.1978); *see State v. Thompson,* 273 Minn. 1, 16, 139 N.W.2d 490, 502–03, *cert. denied sub nom., Thompson v. Minnesota,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966) (when establishing a conspiracy as a crime, proof must be beyond a reasonable doubt; however, when establishing conspiracy as a prerequisite to admission of statements by alleged co-conspirators, only a prima facie showing is required).

Here, it is clear that the trial court did not admit Hoelscher's statements until it was satisfied that sufficient independent evidence of the conspiracy had been introduced by the prosecution. This is demonstrated by the prosecutor's attempt to introduce Hoelscher's statements early in Preece's direct examination. Defense counsel's hearsay objection was sustained on the basis that no conspiracy had yet been established. Subsequently, the trial court ruled:

I consider that the overt acts of the defendant walking into a room where the companion had been told 50 pounds of marijuana would be present and his staying there *is sufficient to establish the conspiracy for purposes of hearsay.*

(Emphasis supplied.) In its memorandum, the trial court elaborated on its ruling, stating:

*I sustained the [hearsay] objection until proof of the conspiracy took place.* This occurred when Preece saw [Jenkins] in the driver's seat of the automobile at the parking lot, led the same automobile to [the motel], entered the room where there was a bale of well-identified marijuana, and Jenkins and Hoelscher entered that room and began talking about the marijuana and the pending cocaine transaction. Then was there surely an act required for admission of all of Hoelscher's statements, beginning at the parking lot * * *.

(Emphasis supplied.)

Although we agree that the trial court improperly considered statements made by Hoelscher once inside the motel room as prima facie evidence supporting *establishment* of a conspiracy, such error was harmless in view of other independent evidence properly admitted for this purpose. We note that less conclusive circumstantial proof than that established in the present case has been properly admitted to support a criminal connection between defendants. *See State v. Huie,* 370 N.W.2d 640 (Minn. Ct.App.1985) (matchbook discovered in co-conspirator's wallet containing defendant's phone number and co-conspirator's phone number in defendant's address book were

facts supporting establishment of a conspiracy).

Jenkins correctly asserts that statements deemed admissible under an exception to or exclusion from the hearsay rule may nonetheless be excluded if the constitutional confrontation rights of the accused are violated. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *see State v. Daniels,* 380 N.W.2d 777 (Minn. 1986); *State v. Hansen,* 312 N.W.2d 96 (Minn.1981).

*Roberts* set forth a two-step analysis for determining whether statements admitted under a hearsay exception violate the confrontation clause: (1) the necessity of statement because of unavailability of the hearsay declarant, and (2) the trustworthiness of the declarations. *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538. Jenkins claims that neither requirement was met in the present case. This argument is unpersuasive in light of the Supreme Court's recent decision in *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), which narrowed *Roberts'* application in cases involving co-conspirators.

In *Inadi,* the Court focused on the unavailability rule as applied in *Roberts* to admission of out-of-court statements by a nontestifying co-conspirator and held that the confrontation clause did not require a showing of unavailability as a prerequisite to admission of the nontestifying co-conspirator's statements. *Inadi,* 475 U.S. at ——, 106 S.Ct. at 1125. The Court's decision was premised on the context in which the statements were made "during the course and in furtherance of the conspiracy." Thus, even if the declarant testified at trial, the testimony would seldom provide the same evidentiary value. *Id.* at ——, 106 S.Ct. at 1126. Moreover, the relative position of the parties will have changed substantially between the time the statements were made and trial. *Id.* at ——, 106 S.Ct. at 1127.

With regard to the reliability of Hoelscher's statements, we take direction from *Daniels,* where the court, focusing on the reliability of a co-conspirator's statements, said: "The admission of declarations which

are not crucial to a case is less likely to involve a denial of defendant's confrontation right." *Daniels*, 380 N.W.2d at 787 (citing *Hansen*, 312 N.W.2d at 102). While Hoelscher's statements were important to the prosecutor's case, we do not believe that the statements were "crucial" in light of remaining evidence strongly indicative of Jenkins' guilt.

### DECISION

Affirmed.