STATE of Minnesota, Respondent,

v.

Anthony J. BELLOTTI, Appellant.

No. C6–85–751.

Court of Appeals of Minnesota.

March 4, 1986.

Review Denied April 24, 1986.

Hubert H. Humphrey, III, State Atty. Gen., Thomas Foley, Ramsey Co. Atty., Darrell C. Hill, Susan E. Gaertner, Asst. Ramsey Co. Attys., St. Paul, for respondent.

Irving Nemerov, Minneapolis, for appellant.

Heard, considered and decided by SEDGWICK, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

SEDGWICK, Judge.

Appellant, Anthony Bellotti, was charged with two counts of second degree criminal sexual conduct under Minn.Stat. § 609.-343(a). Each count involved a different child.

At the pretrial hearing the trial court denied Bellotti's motion to suppress certain out-of-court statements by the children. The court also found one victim incompetent to testify, and the other competent to testify.

The jury found appellant guilty of both counts and acquitted him of a third count not involved on appeal. The trial court denied appellant's motion for a new trial and entered judgment of conviction. We affirm.

## FACTS

At trial, T.C., age four, testified that she played a "pee-er" game and a "bubble gum game" in her friend C.B.'s bedroom with her friend's father. Using anatomically correct dolls, she testified that C.B.'s father took down his pants and touched his "pee-er" in front of the children. She stated that he also took down her pants and C.B.'s pants and touched each one's "pee-er" with his finger. T.C. demonstrated this by touching the genitals of the female doll. She identified C.B.'s father as appellant.

P.C., T.C.'s mother, testified about how the incident came to her attention. T.C. had been playing at Bellotti's house on September 15. While getting ready for church the next day, T.C. volunteered that "[C.B.'s] daddy is an icky man. Right, mommy?" When asked what she meant, she elaborated: "Because he makes you play bubble gum games with your pee-er." P.C. understood "pee-er" to mean the vaginal area, as well as the penis. When P.C. asked what kind of games, T.C. replied "her daddy pulls down my pants and checks my pee-er, and pulls down [C.B.'s] pants and checks her pee-er, and pulls down his own pants and he checks his own pee-er." After returning from church, P.C. called the police. Later that day she observed a "big hunk of bubble gum stuck on the front of the pants that [T.C.] had worn that afternoon." Appellant does not challenge the admission of this hearsay testimony.

Sgt. Lisa Millar interviewed T.C. at the St. Paul Police Department on September 19, 1984. She testified that T.C. told her that C.B.'s dad had touched her on her "pee-er" and demonstrated with anatomically correct dolls by taking off the girl doll's underpants and rubbing her finger in the genital area of the doll. T.C. told Sgt. Millar that appellant had pulled down C.B.'s pants and done the same thing to her. T.C. also demonstrated how appellant was "checking his pee-er" by pulling down the adult male doll's pants and fondling the penis. Afterwards, C.B.'s father gave her bubble gum.

On September 20, C.B., also age four, was interviewed at the St. Paul Police Department by Ann Foster, a social worker with the Ramsey County Human Services Child Abuse Unit. She testified that C.B. demonstrated, using anatomically correct dolls, that her father touched her genitals and T.C.'s genitals with his hand. She also demonstrated to Foster that both children had touched her father's penis, curling her fingers around the penis of the adult male doll.

Ann Foster referred both children to Dr. Carolyn Levitt for medical examinations. Levitt examined T.C. on September 25 at Children's Hospital. At trial, Levitt testified that T.C. told her that appellant had touched each child's "pee-er" with his hand, having pulled down T.C.'s pants, Levitt testified that T.C. told her that appellant pulled down his pants and touched his penis and that he touched C.B.'s genitals with his pee-er. After appellant pulled up his pants he gave both children bubble gum.

Levitt physically examined T.C., using the child's own body to determine where the sexual contact occurred. When Levitt touched her clitoris and asked if appellant had touched her there, T.C. replied affirmatively. She responded negatively to Levitt's questions about touching the entrance to her vagina and her rectum.

On October 3 Levitt interviewed and examined C.B. Levitt testified that C.B. indicated verbally that appellant had pulled down both girl's pants, touched them on the "pee-pee" with his finger while in her bedroom, and gave them bubble gum afterwards. C.B. told Levitt that her dad touched her genitals with his "pee-pee." On her own initiative, she demonstrated how he did this by getting off a chair and sitting on the floor. She "leaned back with her torso back, her knees drawn up and her legs spread apart, and said, 'Something like this.'"

Levitt physically examined C.B. When Levitt touched her clitoris, C.B. responded that her father had touched her there with his "pee-pee." While Levitt touched the entrance to her vagina, C.B. told Levitt that her father had also touched her there with both his "pee-pee" and his finger.

A police sergeant testified to appellant's confession to him that "he was in fact changing his daughter's diapers * * * and that while he was doing that [T.C.] walked up and stood along side of him and removed her clothes, and that he reached out and touched her on the vaginal area. He also said that he did touch [C.B.] on the vaginal area. * * * He said he couldn't explain his actions."

Anthony Bellotti testified that on the morning of the day in question he walked into C.B.'s bedroom to check whether her pants were wet because she had a habit of wetting her pants. He checked her pants and they were wet. He got a wash cloth and started cleaning her when T.C. pulled her pants down and said, "I'm wet. I'm wet too." He finished cleaning C.B., checked T.C., found that her pants were wet, and cleaned her with a wash cloth. He then put T.C. into his daughter's clothes and washed both children's clothes. When the clothes were done he put T.C. back into her clothes and took the children to Arby's.

## ISSUES

1. Did the trial court err in admitting the statements made by T.C. and C.B. to Dr. Levitt?

2. Did the trial court err in admitting T.C.'s remaining out-of-court statements under Minn.Stat. § 595.02, subd. 3?

3. Did the trial court's admission of T.C.'s out-of-court statements violate appellant's constitutional right to confront witnesses?

4. Did the trial court err in admitting C.B.'s out-of-court statements under Minn. Stat. § 595.02, subd. 3?

5. Did the trial court's admission of C.B.'s out-of-court statements violate appellant's constitutional right to confront witnesses?

6. Did the trial court err in admitting Dr. Levitt's medical diagnosis of abuse and her opinion of T.C.'s truthfulness?

## ANALYSIS

1. *Statements of C.B. and T.C. to Dr. Levitt.*

■ The trial court admitted statements of T.C. and C.B. to Dr. Levitt under Minn. R.Evid. 803(4), which allows admission of [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or ex-

ternal source thereof insofar as reasonably pertinent to diagnosis or treatment. Appellant claims that T.C. and C.B. did not make their statements to Dr. Levitt for the purpose of medical diagnosis or treatment, claiming that there was no "injury or illness" for which the patients sought treatment. We disagree. Appellant implies that sexual assault upon a child does not result in injury requiring medical investigation and diagnosis. When the police referred the children to Dr. Levitt, both had stated that they had been sexually assaulted. Their statements warranted medical examination and diagnosis.

■ Appellant also claims that the interviews with Dr. Levitt were made only for purposes of police investigation, and therefore were not conducted for a medical purpose. Disclosure of statements made for medical diagnosis is within Rule 803(4). Under these circumstances, considering the age of the children, and the fact that T.C. was available for cross-examination, there was no error. *See State v. Serna*, 290 N.W.2d 446 (Minn.1980). Before Dr. Levitt physically examined each child, she interviewed her to obtain an idea of what specific sexual contact, if any, may have occurred. The interviews also served to build trust between the doctor and the children to minimize the trauma of the physical examination. Therefore the statements made to Dr. Levitt before the physical examinations were admissible as medical histories pertinent to treatment. *See United States v. Iron Shell*, 633 F.2d 77, 84 (8th Cir.1980) (statements of sexual assault victim to doctor prior to physical examination admissible where they eliminate potential physical problems from the doctor's examination).

■ Dr. Levitt's testimony included statements of the children not admissible under Rule 803(4). Dr. Levitt testified that each child identified appellant as the man who had touched them. Such statements regarding who caused injuries generally are not admissible because they are irrelevant to medical diagnosis and treatment. *See Peterson v. Richfield Plaza, Inc.*, 252

Minn. 215, 89 N.W.2d 712 (1958). However, we hold that the error in admitting the identifying testimony was harmless, given that there was no claim at trial that someone other than appellant committed the assaults.

2. *Admissibility of statements of T.C. under Minn.Stat. § 595.02, subd. 3.*

■ The trial court held T.C.'s remaining out-of-court statements admissible under Minn.Stat. § 595.02, subd. 3 (Supp.1985), which states:

An out-of-court statement made by a child under the age of ten years or a person who is mentally impaired as defined in section 609.341, subdivision 6, alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child or any act of physical abuse of the child or the person who is mentally impaired by another, not otherwise admissible by statute or rule of evidence, is admissible in evidence if:

(a) the court or person authorized to receive evidence finds, in a hearing conducted outside of the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and

(b) the child * * * either:

(i) testifies at the proceedings; or

(ii) is unavailable as a witness and there is corroborative evidence of the act; and

(c) the proponent of the statement notifies the adverse party of his intention to offer the statement and the particulars of the statement sufficiently in advance of the proceeding at which he intends to offer the statement into evidence to provide the adverse party with a fair opportunity to prepare to meet the statement.

The trial court carefully and accurately applied the statute. It found that the following factors indicated sufficient reliability under part (a) of the statute: (1) appellant

had the opportunity to commit the crime; (2) the testimony disclosed no motive of T.C. or the witnesses to fabricate or distort; (3) T.C.'s statements were "reasonably spontaneous;" (4) the statements were not the product of extensive interrogation with leading questions; (5) T.C. used terminology typical to her age; and (6) T.C. was reluctant to speak with men about the incident. Other factors indicating reliability include: (1) the consistency of T.C.'s statement regarding appellant's touching of each child's genitals; (2) the complete spontaneity of T.C.'s initial revelation to her mother, made the day after the assault; (3) the statement to Sgt. Millar was made only four days after the assault; and (4) the fact that T.C. did not agree with everything the questioners asked. The trial court correctly applied the statute by holding a hearing on the admissibility of the evidence outside of the presence of the jury (here before the trial began), unlike the trial court in *State v. Carver*, 380 N.W.2d 821 (Minn.Ct.App. 1986).

Appellant claims that T.C.'s statements are not sufficiently reliable because she was not consistent about certain contacts. T.C. told Dr. Levitt that appellant had touched C.B.'s genitals with his penis, but did not state this at trial or to anyone else. While this inconsistency may render her statement to Dr. Levitt about penile-genital contact with C.B. inadmissible, we hold that the error, if any, was harmless. Appellant was not convicted of first degree criminal sexual assault, and there was substantial and consistent evidence of second-degree assault by appellant touching C.B.'s genitals with his hand.

Part (b) of the statute was met by T.C.'s testimony at trial, and the parties complied with part (c).

■ The trial court erred in admitting T.C.'s hearsay statements about assaults on C.B. under § 595.02, subd. 3, because the statute applies only to statements about assaults on the declarant. However, the error is not reversible because the statements would have been admissible under Minn.R.Evid. 803(24). The same indicia of reliability outlined above also meet Rule 803(24)'s requirement that the statements have "circumstantial guarantees of trustworthiness." *See also D.A.H. v. G.A.H.*, 371 N.W.2d 1 (Minn.Ct.App.1985) (affirming admission of statements of victim of child sexual abuse to psychologist in visitation case under residual hearsay exception; among circumstantial guarantees of trustworthiness were the spontaneity of her statements; fabrication of the story was unlikely; three experts opined that declarant had not fabricated her story; declarant's consistent statements; declarant's fear of men; and certain admissions of the abuser); *M.N.D. v. B.M.D.*, 356 N.W.2d 813 (Minn.Ct.App.1984) (affirming admission of out-of-court statements to investigators and psychologist in visitation case under residual hearsay exception; circumstantial guarantees of trustworthiness included spontaneity of one of the statements; consistency; competency of the declarant, and declarant's abnormal behavior following visits with the alleged abuser).

We affirm admission of statements made to Sergeant Millar under § 595.02, subd. 3, and Minn.R.Evid. 803(24).

3. *Confrontation Clause and T.C.'s out-of-court statements.*

■ Appellant argues that the admission of T.C.'s out-of-court statements denied him his right under the sixth and fourteenth amendments to confront the witnesses against him. No confrontation right was implicated here because T.C. testified and, contrary to appellant's assertions at oral argument, was cross-examined at trial. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); *State v. Ortlepp*, 363 N.W.2d 39, 44 (Minn.1985).

The trial court determined that T.C. had the capacity to remember and to relate facts truthfully and was therefore competent to testify. Minn.Stat. § 595.02, subd. 1(f) (1984). Therefore T.C. was available for cross-examination.

4. *Admissibility of statements of C.B. under § 595.02, subd. 3.*

The trial court found that the following factors indicated sufficient reliability of C.B.'s statements under § 595.02, subd. 3(a): (1) appellant had opportunity to commit the assault; (2) nothing suggested any motive for C.B. or the witnesses to lie; (3) C.B.'s statements were "reasonably spontaneous;" (4) C.B. used terminology typical to a four-year-old; and (5) corroboration by T.C.'s eyewitness testimony and appellant's partial confession. Other factors include: (1) C.B. did not agree with all that was asked; and (2) C.B.'s statement to Ann Foster was made only five days after the incident. The trial court also examined Foster (and Dr. Levitt) as to the circumstances under which C.B. made the statements to them.

▪ The State produced C.B. as a witness. After a hearing, the court found her incompetent to testify and she was therefore unavailable. If the declarant is unavailable, corroborative evidence of her testimony is required. Minn.Stat. § 595.02, subd. 3(b)(ii); *State v. Carver,* 380 N.W.2d 821 (Minn.Ct.App.1986). The trial court correctly found that T.C.'s direct testimony and appellant's partial confession supplied the necessary corroboration.

▪ Appellant claims that there were insufficient indicia of reliability because the trial court found C.B. incompetent to testify at trial. We disagree. Incompetency to testify at trial does not alone render a statement inadmissible. *In Re Chuesberg,* 305 Minn. 543, 233 N.W.2d 887 (1975); *State v. Brown,* 278 Minn. 186, 153 N.W.2d 229 (1967); *State v. Gorman,* 229 Minn. 524, 40 N.W.2d 347 (1949). Competency to testify concerns, in part, the child's present ability to remember. If a child cannot remember at trial an incident occurring months previously, she may nevertheless have remembered the incident and truthfully related it at the time she made the out-of-court statement. This is "particularly true of children who have short memories and cannot accurately remember events occurring months or years

prior to the competency hearing." Note, *Minnesota's Hearsay Exception for Child Victims of Sexual Abuse,* 11 Wm.Mitchell L.Rev. 799, 819 (1985). The trial court did not err in permitting admission of out-of-court statements of C.B. made five days after the incident. The trial court did not abuse its discretion in determining that the circumstances under which C.B.'s statements were made were sufficiently reliable.

The trial court erred in permitting C.B.'s hearsay statements to Foster about assaults on T.C. under § 595.02, subd. 3. *See supra.* However, the error here was not reversible because the statements were admissible under the residual exception for unavailable declarants, Minn.R.Evid. 804(b)(5). *See* discussion of T.C.'s out-of-court statements about assaults on C.B. *supra.*

We affirm admission of statements made to Ann Foster under § 595.02, subd. 3, and Minn.R.Evid. 804(b)(5).

5. *Confrontation clause and C.B.'s out-of-court statements.*

▪ a. *Facial constitutionality.* Appellant argues that § 595.02, subd. 3 is unconstitutional on its face. This argument lacks merit because the statute incorporates the test of constitutionality in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). First, there must be necessity for the out-of-court statement. *Id.* at 65, 100 S.Ct. at 2538. This is usually established by the unavailability of the declarant. *Id.* Such instances fall under § 595.02, subd. 3(b)(ii). Second, the statement must bear adequate "indicia of reliability." *Id.* at 66, 100 S.Ct. at 2539. *See also State v. Hansen,* 312 N.W.2d 96, 102 (Minn.1981). This is required in subd. 3(a) ("the time, content, and circumstances of the statement * * * provide sufficient indicia of reliability."). Subd. 3(a)'s requirement that "the reliability of the person to whom the statement is made" also contribute to sufficient indicia of reliability goes

beyond the requirements for facial constitutionality under the confrontation clause.

■ b. *Constitutionality as applied.* C.B. was unavailable because the trial court found her incompetent to testify. The State made the required good-faith effort to obtain her testimony by producing her at the competency hearing. *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543; *Haggins v. Warden*, 715 F.2d 1050, 1055 (6th Cir. 1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984). This is not a case of stipulated incompetency, which is not a proper basis for finding unavailability in the constitutional sense in at least two jurisdictions. *State v. Campbell*, 299 Or. 633, 705 P.2d 694, 705 (1985); *State v. Ryan*, 103 Wash.2d 165, 171, 691 P.2d 197, 203 (1984).

Adequate indicia of reliability may be shown where the statement has "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. We hold that the particularized factors which the trial court held constituted sufficient indicia of reliability are adequate indicia of reliability under the confrontation clause. The factors include several which are traditionally viewed as indicating reliability, such as strong corroboration (by T.C.'s direct testimony, her statement to her mother and appellant's confession) and lack of motive for C.B. to lie. Together, the numerous particularized factors cited by the trial court meet the constitutional standards outlined in *Roberts*.

■ *Roberts* also discussed reliability in terms of the statement having been subjected to the substantial equivalent of cross-examination. However, there are instances in which sufficiently trustworthy statements by unavailable declarants are admitted in accordance with the constitution even though they have not been cross-examined. We adopt the reasoning in *Barker v. Morris*, 761 F.2d 1396, 1400–1401 (9th Cir.1985):

> While always central to Confrontation Clause analysis and even dispositive in some cases, *cross-examination is not required in every case. [U.S. v.] Nick*, 604 F.2d [1199] at 1203 ("availability of cross-examination [is] not the sole criterion by which to test the admissibility of hearsay over confrontation clause objection"); *United States v. King*, 552 F.2d 833, 846 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). *Accord [United States v. West*, 574 F.2d 1131, 1137 (4th Cir.1978); *United States v. Carlson*, 547 F.2d 1346, 1356–57 (8th Cir.1976), *cert. denied*, 431 U.S. 914 [97 S.Ct. 2174, 53 L.Ed.2d 224] (1977); *Hoover v. Beto*, 467 F.2d 516, 532 (5th Cir. 1972) (en banc), *cert. denied*, 409 U.S. 1086 [93 S.Ct. 703, 34 L.Ed.2d 673] (1972) ]; *see also Dutton [v. Evans]* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (admission of uncross-examined statement by nontestifying coconspirator did not violate Confrontation Clause). Indeed, many hearsay statements contain sufficient indicia of reliability to be admissible despite the absence of cross-examination by the defendant. *See* Fed.R. Evid. 804(b)(2) (dying declarations); Fed.R.Evid. 804(b)(3) (statements against interest); Fed.R.Evid. 803(1) (present sense impressions); Fed.R.Evid. 803(2) (excited utterances); *see also King*, 552 F.2d 833 (9th Cir.1976) (statement of coconspirator which possesses sufficient indicia of reliability); *Dutton*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (same); *United States v. Fleishman*, 684 F.2d 1329 (9th Cir.) (same), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *[U.S. v.] Perez*, 658 F.2d 654 (same); *[U.S. v.] Snow*, 521 F.2d 730 [9th Cir.1975] (same). Thus, *circumstances other than prior cross-examination of the declarant by the defendant can show evidence to be trustworthy to a degree that warrants its submission to the jury.*

(Emphasis added.) *See also United States v. Nick*, 604 F.2d 1199 (9th Cir.1979) (If the sole method of satisfying the confrontation clause was opportunity to cross-examine at the time the statement was made, many kinds of admissible hearsay would violate the confrontation clause); *United States v.*

*Carlson,* 547 F.2d 1346, 1356 (8th Cir.) *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) ("The fact that a defendant is unable to cross-examine the declarant is not always controlling on the confrontation issue since the right of cross-examination is not absolute.")

The Supreme Court analyzed particularized guarantees of trustworthiness in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). The Court affirmed admission of an out-of-court statement by a coconspirator to his cell-mate because, among other reasons, the substance of the testimony was abundantly established by other admissible testimony, the extremely remote possibility that the coconspirator's statement was based on faulty recollection, there was reason to suppose that the coconspirator did not misrepresent the defendant's involvement in the crime, the statement was spontaneous, and it was against the coconspirator's penal interest to make it. *Evans,* 400 U.S. at 88–89, 91 S.Ct. at 219. The trial court here similarly analyzed the circumstances under which C.B.'s out-of-court statements were made.

Additionally, we recognize the Supreme Court's statement that

> "general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case." Significantly, every jurisdiction has a strong interest in effective law enforcement * * *.

*Roberts,* 448 U.S. at 64, 100 S.Ct. at 2538 (citations omitted). *See also Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895). The Minnesota legislature has enacted a statute in order to extend the circumstances in which hearsay testimony of child abuse victims is admissible, consistent with the constitutional guarantees incorporated into the statute. The legislature did not want to allow child abusers to escape conviction merely by choosing victims who, due to their age or otherwise, are unavailable to testify at trial. These public policy considerations,

which the Supreme Court allows us to consider, bolster our interpretation of § 595.-02, subd. 3.

### 6. *Dr. Levitt's medical diagnosis and opinion of T.C.'s truthfulness.*

■ Dr. Levitt testified, over objection of appellant's counsel, to her opinion that T.C. was truthful in her statements and to her opinion that each child had been sexually abused. Expert testimony concerning the credibility of a witness is admissible in child sexual assault cases only in strictly limited circumstances. The general rule is otherwise. *See State v. Saldana,* 324 N.W.2d 227, 231 (Minn.1982). In *State v. Myers,* 359 N.W.2d 604, 611 (Minn.1984), the supreme court observed:

> As a general rule, however, we would reject expert opinion testimony regarding the truth or falsity of a witness' allegations about a crime, for the expert's status may lend an unwarranted "stamp of scientific legitimacy" to the allegations. (citation omitted)

*Myers* ultimately affirmed admission of the expert's opinion that the child's allegations were truthful because "defendant had waived his right to object to this expert's testimony by 'opening the door' in his cross-examination of the complainant's mother" about her opinion of the child's truthfulness. *State v. Miller,* 377 N.W.2d 506, 508 (Minn.Ct.App.1985). The circumstances here were unlike those in *Myers.* Although the credibility of T.C. was at issue, the defendant did not "open the door" to expert testimony concerning her truthfulness. There is no recognized unlimited exception for child victims in a sex case. This was not a situation where the complaining witness denied her earlier statements. *See In Re R.B.,* 369 N.W.2d 353 (Minn.Ct.App.1985). The defendant submitted no direct testimony of his own addressing T.C.'s truthfulness, and cross-examination of the complainant does not open the door to expert testimony. *State v. Miller,* 377 N.W.2d 506, 509 (Minn.Ct. App.1985).

■ Despite these factors and the general rule, we hold that the error in admit-

ting the truthfulness opinion did not rise to the level of reversible error. The State's attorney did not rely on the opinion concerning T.C.'s truthfulness in her closing argument. The statement was not repeatedly called to the attention of the jury. In her testimony Dr. Levitt stated her opinion concerning truthfulness only once, and this was in connection with another general admissible statement. In viewing the totality of the record and the circumstances surrounding the testimony, there is sufficient evidence in the record to sustain the conviction. We do not find the statement so prejudicial that a new trial is mandated.

## DECISION

Dr. Levitt's testimony concerning T.C.'s and C.B.'s out-of-court statements was properly admitted under Minn.R.Evid. 803(4). The trial court did not err in admitting the remaining hearsay statements under Minn.Stat. § 595.02, subd. 3 (Supp. 1985). Section § 595.02, subd. 3, was applied constitutionally. The trial court did not err in permitting Dr. Levitt to testify to her opinion that the children were sexually abused. Admission of Dr. Levitt's opinion that T.C. was telling the truth, while error, is not so prejudicial, in this case, as to mandate a new trial.

Affirmed.

CRIPPEN, J., concurs specially.

CRIPPEN, Judge (concurring specially).

I concur in the analysis of this case by the majority. However, it is my opinion that the law of the case requires further judicial and legislative review. Several determinations made here involve critical conflict between fundamental liberties of the accused and a systematized pattern of proof of facts in child abuse cases.

The most pronounced problem in the case has to do with evidence about medical interviews.[1] When diagnosis is primarily an assessment of medical history, it is nearly impossible to distinguish medical conclusions from judgments that substitute for those of the jury or other legal fact finder. The problem was highlighted here by the improper testimony of Dr. Levitt. The prosecutor asked the doctor if she had determined "a medical diagnosis" regarding T.C., and the doctor responded by stating her feeling that T.C. "had been truthful in her statements" and had been abused. Whether or not the problem so graphically unfolds, it is there—the diagnosis is an assessment of truthfulness.

This is not an isolated medical evidence issue. Given the legal significance of the medical "diagnosis," there is established inevitably a deliberate pattern to enhance testimony by having it observed, recited, and accredited by a medical doctor.

The use of hearsay evidence offered through two other interviewers, a police sergeant and a social worker, is similarly troublesome. The process involves judicial scrutiny of reliability, which was done with painstaking care by the trial judge here. Nevertheless, the interview practice becomes increasingly commonplace, and in every case it poses a danger of substituting the impressions and recollections of interviewers for the fact finding of a jury.

As the majority concludes, the trial here was fair. More to the point, it was as fair as could occur under standards of procedure currently in force. Those standards need further attention because of the risk of injustice demonstrated in this case and others.

The issues discussed here specifically invite attention to one prospective change of process. Interviews of victims by police, social workers, and doctors are by now a

1. Our analysis of the patient statements admissible under Minn.R.Evid. 803(4) harmonizes with the broad language of the rule on statements that describe "the inception or general character of the cause or external source" of symptoms, even though we have found no cases utilizing this hearsay exception where an apparent victim is taken to a doctor, as here, 10 days after an alleged assault, and where this contact is evidently not made for treatment of injuries. An excellent discussion of the rule and its broad policy bases is found in a case cited by the majority, *United States v. Iron Shell,* 633 F.2d 77, 82–5 (8th Cir.1980).

systematized part of abuse case investigations. As such, the interview practice could be uniformly regulated. It may be feasible, for example, to require that interviews be filmed. When hearsay evidence is otherwise admissible, this practice would give the fact finder much greater opportunity to assess the evidence. It would also enhance the ability of the trial judge to determine whether there are adequate indications the hearsay evidence is reliable and admissible.