*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1573**

State of Minnesota,
Respondent,

vs.

Daryl Shannon Williams,
Appellant.

**Filed March 11, 2024**
**Reversed and remanded**
**Larson, Judge**

Hennepin County District Court
File No. 27-CR-21-22599

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Assistant County Attorney,
Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Larson, Judge; and John

Smith, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

**LARSON**, Judge

Respondent State of Minnesota charged and tried appellant Daryl Shannon Williams for attempted second-degree intentional murder based on a shooting that occurred at a gas station. A jury found Williams guilty, and the district court sentenced Williams to 153-months imprisonment. Williams appeals his conviction, arguing that numerous evidentiary errors occurred during his trial, each of which entitles him to a new trial. Because we agree that several errors occurred during Williams's trial, which cumulatively deprived him of a fair trial, we reverse the conviction and remand to the district court for a new trial.

**FACTS**

On November 20, 2021, police were dispatched to a gas station in Brooklyn Park in response to a 911 call reporting a shooting. Responding officers found the victim, B.B., sitting in his vehicle with several gunshot wounds. B.B. was slumped over in his seat, and one officer testified that B.B. appeared to be in shock. The video from one of the officer's body-worn cameras shows B.B. suffering from the physical trauma of several gunshot wounds. In the video, B.B. repeatedly, unprompted, and in a tone approaching panic, asked the officers to "help [him]." When asked where he was shot, B.B. shouted "everywhere!" When the officers started rendering medical aid, B.B. stated, "I'm losing it" and began losing consciousness. One officer then asked B.B. who shot him, to which B.B. responded "Joker" or "Joker shot me" (hereinafter, "statement made minutes after the shooting").

Paramedics took B.B. to a hospital where he was treated for life-threatening injuries resulting from 11 gunshot wounds to his torso and limbs. B.B. suffered damage to his right

kidney, left lung, liver, bladder, small intestine, the spermatic cord, and blood vessels bringing blood to his right testicle. B.B. underwent several surgeries. While in the hospital, B.B. was sedated and on pain medication. During that time, detectives spoke with B.B. about the shooting. According to Williams's attorney, B.B. told detectives "Mr. Joker shot me. But I'm not certain that it was Joker," and "I'm not 100 percent sure. Actually, I don't even want to prosecute" (hereinafter, "statements made in the hospital").

After his discharge from the hospital, about a week later, a detective interviewed B.B. again. According to the county attorney, B.B. told the detective that he did not recall speaking with the detective a week earlier and that he had been "out of it." The county attorney further stated that B.B. also told the detective that "Joker" shot him, and provided the detective with a photograph of the person he knew as Joker (hereinafter, "statement identifying the shooter"). At trial, the state elicited testimony from a detective that B.B. provided the detective with a picture of the person B.B. believed to be the shooter. The detective testified that he later showed the photograph to Williams, who identified himself as the same person that B.B. identified as the shooter.

Following an investigation, the state charged Williams with attempted second-degree intentional murder, pursuant to Minn. Stat. § 609.19, subd. 1(1) (2020), and the case proceeded to a jury trial. At trial, Williams attempted to present the defense that another person shot B.B. based on B.B.'s consistent identification of the shooter as "Joker," a nickname Williams claims he has never used. The district court, however, sustained the state's hearsay objections to Williams's attempts to enter evidence that B.B. identified "Joker" as the shooter. Regarding the statement made minutes after the shooting, the

district court found the statement was not an excited utterance because Williams had failed to show that B.B. was sufficiently under the aura of excitement when he made the statement. And for B.B.'s statements made in the hospital, the district court determined the statements lacked sufficient guarantees of trustworthiness to fall within the residual exception to the hearsay rule.

The state called eight witnesses, including several responding officers and investigating detectives. The state also presented security-camera videos (1) from Williams's apartment building, depicting an individual resembling Williams on the day of the shooting; (2) from the gas station, during daylight, and hours before the shooting, showing an individual wearing similar clothes and driving a similar vehicle as Williams; and (3) from the gas station, in the evening, depicting darkened images of the shooting itself. The state elicited testimony from detectives that they believed the person who appeared in the security-camera video from the apartment building was the same person who appeared in the security-camera video from the gas station several hours before the shooting, and that the person in both videos was Williams. One of the detectives testified that he believed Williams was the shooter. The state also called B.B.'s surgeon, who testified about the extent and nature of B.B.'s injuries resulting from the shooting. B.B. did not testify at trial because the state could not locate him to personally serve a subpoena.

At the conclusion of trial, the jury found Williams guilty. The district court convicted Williams and sentenced him to 153-months imprisonment. Williams appeals.

**DECISION**

Williams appeals his conviction, arguing numerous evidentiary errors occurred during his trial. Some alleged errors were objected to while others passed without objection. Williams asserts that each error individually, or considered collectively, deprived him of a fair trial, requiring reversal of his conviction and remand to the district court for a new trial.

We review objected-to evidentiary rulings for an abuse of discretion. *State v. Penkaty*, 708 N.W.2d 185, 201 (Minn. 2006). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Tapper*, 993 N.W.2d 432, 437 (Minn. 2023) (quoting *State v. Vangrevenhof*, 941 N.W.2d 730, 736 (Minn. 2020)). If a district court abuses its discretion when excluding evidence offered by the defendant, "we reverse only if the exclusion of evidence was not harmless beyond a reasonable doubt." *State v. Zumberge*, 888 N.W.2d 688, 694 (Minn. 2017). "An error is harmless beyond a reasonable doubt if the jury's verdict was surely unattributable to the error." *State v. McInnis*, 962 N.W.2d 874, 886 (Minn. 2021).

When a party fails to object to the admission of evidence, that failure typically "constitutes a waiver of the right to appeal on that basis." *State v. Tscheu*, 758 N.W.2d 849, 863 (Minn. 2008). However, we may consider an unobjected-to error under the plain-error standard of review. *Id.* Under this standard, we evaluate whether "there was (1) error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." *Id.* An error is plain when it "contravenes case law, a rule, or a standard of conduct." *State v.*

5

*Zinski*, 927 N.W.2d 272, 275 (Minn. 2019) (quoting *State v. Hayes*, 831 N.W.2d 546, 555 (Minn. 2013)).  An error affects a defendant's substantial rights when "there is a reasonable likelihood that the error had a significant effect on the jury's verdict."  *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn. 2010).  In considering whether the error had a significant effect on the verdict, we consider "the strength of the State's case, the pervasiveness of the error, and whether the defendant had an opportunity to respond to the testimony."  *Id.* at 873.  If a defendant demonstrates that all three requirements are satisfied, "an appellate court may correct the error only when it seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022).

With these standards in mind, we review Williams's arguments.  We address Williams's evidentiary arguments in part I.  In part II, we address whether any evidentiary errors warrant a new trial.

**I.**

We begin our analysis by assessing whether any evidentiary errors occurred during Williams's trial.  Williams argues: (1) the district court misapplied the rules of evidence with regard to B.B.'s out-of-court statements; (2) the lead detective improperly testified that he believed Williams was the shooter; (3) the detectives offered improper opinion testimony regarding the security-camera videos; and (4) the surgeon improperly testified about B.B.'s privileged medical information.  We address each category of evidence below.

### A.    Out-of-Court Statements

We begin with Williams's challenges to the district court's decisions to admit or exclude certain out-of-court statements B.B. made to law enforcement.  Generally, out-of-court statements "made by a nonparty and offered to prove the truth of the matter asserted [are] inadmissible hearsay." *State v. Chauvin*, 989 N.W.2d 1, 31 (Minn. App. 2023) (citing Minn. R. Evid. 801(c), 802), *rev. denied* (Minn. July 18, 2023).  But this general prohibition is subject to many exceptions.

Here, Williams argues that the district court: (1) abused its discretion when it determined B.B.'s statement made minutes after the shooting was not admissible under the excited-utterance hearsay exception, Minn. R. Evid. 803(2); (2) abused its discretion when it determined B.B.'s statements made in the hospital were not admissible under the residual hearsay exception, Minn. R. Evid. 807; and (3) plainly erred when it admitted testimony that B.B. identified the shooter.

### 1.    Statement made minutes after the shooting

Williams argues that the district court erred when it determined B.B.'s statement made minutes after the shooting was not an excited utterance.  Specifically, Williams sought to admit evidence that B.B. responded with "Joker" or "Joker shot me," when the officer asked who shot him.  Because the state objected to Williams offering this evidence, we review this issue for an abuse of discretion.  *See Penkaty*, 708 N.W.2d at 201.

Under Minn. R. Evid. 803(2), an exception to the general hearsay prohibition exists for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  The rationale for the

7

exception "stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement." *State v. Daniels*, 380 N.W.2d 777, 782 (Minn. 1986) (quoting Minn. R. Evid. 803(2) 1977 advisory comm. cmt.). Three requirements must be met to qualify as an excited utterance: (1) "there must be a startling event or condition"; (2) "the statement must relate to the startling event or condition"; and (3) "the declarant must be under a sufficient aura of excitement caused by the event or condition to insure the trustworthiness of the statement." *Id.* (quoting Minn. R. Evid. 803(2) 1977 advisory comm. cmt.).

The district court's decision that B.B.'s statement made minutes after the shooting did not qualify as an excited utterance rested on the third requirement. When evaluating the third requirement, courts must consider "all relevant factors." *Id.* Relevant factors include "the length of time elapsed, the nature of the event, the physical condition of the declarant, [and] any possible motive to falsify." *Id.* at 782-83. A district court may also consider whether the statement was made in response to a question. *Tapper*, 993 N.W.2d at 438. A statement "is not necessarily rendered inadmissible by the fact that the declaration was made in response to a question," but it may be a relevant consideration as to whether the statement "was spontaneous and excited." *Id.* (quoting *In re Chuesberg's Welfare*, 233 N.W.2d 887, 889 (Minn. 1975)). Further, while "a physical manifestation of stress will often be a key indicator of an aura of excitement," such a physical manifestation "is not necessarily required." *Id.*

Here, the district court determined that, at the time B.B. made the statement, B.B. was no longer under a sufficient aura of excitement to ensure the statement's

8

trustworthiness.[1]  Specifically, the district court found that, at the time he made the statement, B.B. "was essentially nonresponsive."  The district court recited the testimony that B.B. "appeared to be in shock[,] . . . that [B.B.] was slumped, leaned over, that he was not talking, [and] that he was only responding to direct questions."  The district court, thus, distinguished B.B.'s statement from other excited-utterance cases on the basis that B.B. was not "clearly in an excited state."  But the evidence does not support this finding.

The video from the officer's body-worn camera, taken just minutes after the shooting, does not show that B.B. was "essentially nonresponsive" when he made the statement.  The video shows B.B., who had just been shot 11 times, repeatedly, unprompted, and in a tone approaching panic, asking the officer to "help [him]."  When asked where he was shot, B.B. shouted "everywhere!"  And when the officer started rendering medical aid, B.B. stated "I'm losing it" and he began losing consciousness.  It is in this context that the officer asked B.B. who shot him, and he replied "Joker" or "Joker shot me."  Based on our review, the video does not support the district court's finding that B.B. was "essentially nonresponsive" when he made the statement.

Moreover, the other relevant factors favor a determination that B.B.'s statement was admissible as an excited utterance.  *See Daniels*, 380 N.W.2d at 782 (listing the relevant factors).  B.B.'s statement was made mere minutes after the shooting.  The nature of the event—a shooting in a gas station parking lot—would be startling to almost anyone and

---

[1] Based on its analysis, the district court seemed to require B.B. to have been outwardly agitated in order to admit the statement as an excited utterance.  But in *Tapper*, the supreme court noted that a physical manifestation of stress "is not necessarily required" for the statement to qualify as an excited utterance.  993 N.W.2d at 438.

certainly to B.B., who had been shot 11 times. B.B. was in poor physical condition at the time he made the statement, having suffered damage to his right kidney, left lung, liver, bladder, small intestine, the spermatic cord, and blood vessels bringing blood to his right testicle. And given B.B.'s own description that he was losing consciousness at the time he made the statement, there is little, if any, possibility that B.B. "conscious[ly] fabricat[ed]" the statement. *See id.* (quoting Minn. R. Evid. 803(2) 1977 advisory comm. cmt.). For these reasons, we conclude the district court abused its discretion when it excluded the statement made minutes after the shooting.

### 2. Statements made in the hospital

Williams next challenges the district court's decision that the statements made in the hospital were not admissible under the residual exception to the hearsay rule.[2] Specifically, Williams sought to admit the following statements B.B. made to detectives: "Mr. Joker shot me. But I'm not certain that it was Joker" and "I'm not 100 percent sure. Actually, I don't even want to prosecute." Because the state objected to Williams offering this evidence, we review this issue for an abuse of discretion. *See Penkaty*, 708 N.W.2d at 201.

The residual exception provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a

---

[2] Williams also argues that the district court's concern that allowing the statements into evidence could lead to Confrontation Clause issues was error. But because we determine that the testimony was inadmissible hearsay, we need not reach the Confrontation Clause question.

material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Minn. R. Evid. 807. "The decision to admit hearsay statements under Rule 807 has two steps." *State v. Hallmark*, 927 N.W.2d 281, 292 (Minn. 2019). First, the district court must "look at the totality of the circumstances to determine whether [the] hearsay statement has 'circumstantial guarantees of trustworthiness.'" *State v. Davis*, 864 N.W.2d 171, 181 (Minn. 2015) (quoting *State v. Robinson*, 718 N.W.2d 400, 408 (Minn. 2006)). Second, the district court must "determine whether the three enumerated requirements of Rule 807 are met." *Hallmark*, 927 N.W.2d at 293.

Here, the district court determined the statements made in the hospital were inadmissible under the residual exception on the basis that the statements did not have circumstantial guarantees of trustworthiness. Williams argues the statements made in the hospital did have circumstantial guarantees of trustworthiness because the statements were recorded, the detectives asked B.B. open-ended questions, there was no evidence of coercion, and B.B. was in an environment where he would have felt comfortable and supported.

Upon reviewing the record, we agree with the district court that the weight of the evidence indicates that B.B.'s statements were not reliable. B.B. was heavily sedated while he was in the hospital and heavily medicated when he spoke with the detectives. B.B. had just undergone multiple major surgeries, and when a detective spoke to B.B. one week later, B.B. could not recall speaking to the detectives in the hospital. And while the

11

arguments Williams makes may indicate the detectives did not pressure B.B. into giving favorable responses during the interview, the circumstances provide no guarantees that B.B. was telling the truth. None of the factors Williams highlights establish the trustworthiness of the statements B.B. made while speaking with the detectives in the hospital.

For these reasons, we conclude that the district court did not abuse its discretion when it excluded B.B.'s statements made in the hospital.

### 3. Statement identifying the shooter

Williams argues the district court erred when it allowed the state to admit evidence of B.B.'s statement identifying the shooter. Specifically, Williams challenges testimony from a detective that the detective "was given a photo, and it was pointed out that the person in that photo was the shooter." Moments later, when shown the photograph, that same officer testified that it was the "photograph provided to me by the victim." Because Williams did not object to the state admitting this evidence, we review this issue for plain error. *See Tscheu*, 758 N.W.2d at 863.

Williams argues that admitting B.B.'s statement identifying the shooter violated his rights under the Confrontation Clause of the Sixth Amendment to the U.S. Constitution.[3] We review whether the admission of evidence violated the Confrontation Clause de novo. *State v. Sutter*, 959 N.W.2d 760, 764 (Minn. 2021). The Sixth Amendment guarantees a

---

[3] Williams separately argues the statement identifying the shooter was inadmissible hearsay. Because we conclude that admitting the statement violated the Confrontation Clause, we do not reach this issue.

criminal defendant the right to be confronted with the witnesses against them. U.S. Const. amend. VI; *see also* Minn. Const. Art. 1, § 6. This protection applies to the states through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). A defendant's rights under the Confrontation Clause are violated when a court admits a statement and (1) "the statement in question was testimonial," (2) "the statement was admitted for the truth of the matter asserted," and (3) "the defendant was unable to cross-examine the declarant." *Sutter*, 959 N.W.2d at 765.

Williams has demonstrated that all three criteria are met here. First, B.B.'s statement identifying the shooter was testimonial because it was made to a detective for the purpose of establishing past events relevant to a criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding a statement is testimonial when it is given to police and "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"). Second, the state offered the statement for the truth of the matter asserted—that the person in the photo was the shooter. And finally, Williams was unable to cross-examine B.B. because the state did not call B.B. to testify.

The state disagrees. Citing *State v. Litzau*, 650 N.W.2d 177 (Minn. 2002), the state first argues that the statement did not violate the Confrontation Clause because it was not offered for the truth of the matter asserted. According to the state, because the out-of-court statement "did not contain any out-of-court statements attributed to B.B."[4] and the

---

[4] The state's assertion is unconvincing because the detective's two statements make it clear that B.B. gave the officer the photo and identified Williams as the shooter.

testimony "explained law-enforcement action," it did not violate the Confrontation Clause. We are not persuaded.

"In criminal cases, evidence that an arresting or investigating officer received a tip for purposes of explaining why the police conducted surveillance is not hearsay." *Litzau*, 650 N.W.2d at 182. Nevertheless, "a police officer testifying in a criminal case may not, under the guise of explaining how [the] investigation focused on defendant, relate hearsay statements of others." *State v. Williams*, 525 N.W.2d 538, 544 (Minn. 1994) (alteration in original) (quoting *State v. Cermak*, 365 N.W.2d 243, 247 (Minn. 1985)); *see also State v. Hardy*, 354 N.W.2d 21, 24-25 (Minn. 1984) ("[E]ven a limited elicitation, for nonhearsay purposes, of general testimony that a tip had been received that led to defendant's prints being compared with the latent print would have been unjustified in this case because the potential of the evidence being used for an improper purpose outweighed its very limited probative value.").

Here, the record plainly shows the state introduced B.B.'s statement identifying the shooter for the truth of the matter asserted. The state relied on B.B.'s identification twice during closing argument. The first time, the prosecutor stated: "You heard that the detectives received a photograph of the shooter from [B.B.], that three of those individuals . . . were not implicated in this offense at all and that . . . [Williams] identified himself as the person on the far right [of the photograph]." The second time, the prosecutor said: "[B.B.] gave a photograph that the officers learned was involved contained the shooter, [and] that Mr. Williams identified himself as the same person." The state clearly relied on

14

B.B.'s statement for the truth of the matter asserted—that the individual identified in the photograph was the shooter.

The state next argues the admission of the statement did not violate the Confrontation Clause because Williams initially elicited the testimony that B.B. identified the shooter in the photograph.[5] But the U.S. Supreme Court has never held "that defendants can 'open the door' to violations of constitutional requirements merely by making evidence relevant to contradict their defense." *Hemphill v. New York*, 595 U.S. 140, 154 (2022). In *Hemphill*, the U.S. Supreme Court held that the trial court erred when it admitted unconfronted testimonial hearsay on the grounds that the defendant had "created a misleading impression that the testimonial hearsay was reasonably necessary to correct." *Id.* at 153. The situation in this case is not identical to *Hemphill*, but the underlying rationale dictates a similar result: regardless of what evidence Williams introduced earlier in the trial, because Williams could not confront the declarant of the hearsay statement offered into evidence by the state, the state was barred from entering the statement into evidence.

---

[5] The state is correct that B.B.'s identification of the shooter in the photograph was first raised by Williams. As described above, this fact is irrelevant to whether a Confrontation Clause violation occurred. In another case, under a plain error standard of review, this fact might be relevant to whether a violation affected the defendant's substantial rights. But, as set forth in part II, we conclude the errors that occurred during Williams's trial cumulatively deprived him of a fair trial. Thus, we need not decide whether this error, standing alone, affected Williams's substantial rights. *See State v. Keaton*, 589 N.W.2d 85, 91 (Minn. 1998) (declining to determine whether each error, standing alone, would warrant a new trial because the "errors, taken cumulatively, deprived the appellant of his right to a fair trial").

Finally, the state argues that it did not violate Williams's Confrontation Clause rights because Williams could have called B.B. as a witness. Again, we are not persuaded. The fact that Williams could have called B.B. to testify does not relieve the state of its duty to allow Williams to confront a declarant if the state wishes to rely on a statement. *Cf. Anderson v. State*, 830 N.W.2d 1, 9 (Minn. 2013) (state bears the burden of proving that a statement is not testimonial); *State v. Warsame*, 735 N.W.2d 684, 696 (Minn. 2007) (state bears the burden of proving that defendant's Sixth Amendment rights were not violated); *State v. King*, 622 N.W.2d 800, 807 (Minn. 2001) (state bears the burden of establishing witness unavailability and consequent necessity of hearsay evidence). As the proponent of the hearsay statement, it was the state's burden to permit Williams to confront the witness who offered the statement against him.

Because Williams's Confrontation Clause rights were violated, we conclude that plain error occurred when the statement identifying the shooter was admitted.

### B.  Opinion Testimony—Williams's Guilt

We next address Williams's argument that the district court erred when it allowed the lead detective to opine that Williams shot B.B. Specifically, the state elicited the following testimony from the lead detective:

> [STATE]:  Detective, did your review of these videos further
> your investigation in any way?
> [DETECTIVE]:  Yes.
> [STATE]:  Did they help you form any conclusions about who
> the shooter was?
> [DETECTIVE]:  They did.
> [STATE]:  And who did you believe the shooter was after that?
> [DETECTIVE]:  Daryl Williams.

16

. . . .

> [STATE]:  Based on your full investigation who do you believe the shooter on November 20th of 2021 was?
> [DETECTIVE]:  Daryl Williams.

Because Williams did not object to the state introducing this evidence, we review this issue for plain error.

The state must ensure that its witnesses know the limits of permissible testimony. *State v. Underwood*, 281 N.W.2d 337, 342 (Minn. 1979).  In *State v. Hogetvedt*, we concluded it was impermissible for a police officer to testify that he believed the appellant was guilty of the charged crime.  623 N.W.2d 909, 915 (Minn. App. 2001), *rev. denied* (Minn. May 29, 2003).  There, the district court informed the state that it would be "totally improper" for a police officer to testify that he believed the defendant was guilty.  *Id.* Despite this ruling, the officer testified that he believed the appellant assaulted the complainant.  *Id.*  The appellant objected, and the district court struck the officer's testimony from the record.  *Id.*  The district court also instructed the jury that the officer's opinion was not evidence, and only the jury's opinion mattered.  *Id.*  Despite these safeguards, we determined reversible error occurred when the state elicited the officer's opinion regarding the appellant's guilt and remanded for a new trial.  *Id.* at 916.

The state makes two attempts to distinguish *Hogetvedt*.  First, the state asserts that *Hogetvedt* is factually more egregious because the police officer's testimony directly contravened the district court's order.  Second, the state argues the issue addressed in *Hogetvedt* is not reviewable when the defendant fails to object at trial because the opinion

17

relies on the district court's prior ruling that the testimony was "totally improper." We are not persuaded.

First, the testimony in this case is somewhat *more* egregious than in *Hogetvedt*. Here the *state* asked *two* leading questions seeking to elicit the lead detective's personal belief that Williams was the shooter. In contrast, the police officer in *Hogetvedt* articulated his belief in response to an open-ended question. *Id.* at 915 ("Q: And what was your response when she said that? A: Well, I told her . . . that *I believed it was [appellant] that assaulted her.*" (alterations in original)). Thus, we are not persuaded that *Hogetvedt* is distinguishable on the basis that the conduct was more egregious.

Second, we disagree that *Hogetvedt*'s reliance on the district court's pretrial order shields the issue from plain-error review. In our nonprecedential decision in *State v. Yual*, we concluded a police officer's testimony about the issue of guilt was plain error, relying on *Hogetvedt*. No. A07-0946, 2008 WL 2492293 (Minn. App. June 24, 2008), *rev. denied* (Minn. Aug. 19, 2008).[6] There, a police officer opined that "a crime definitely had occurred." *Id.* at *3. Comparing the case to *Hogetvedt*, we reiterated the importance of the "state's duty to 'ensure that its witnesses know the limits of permissible testimony,'" and determined that the district court plainly erred when it allowed the state to admit the officer's impermissible testimony.[7] *Id.* at *4 (quoting *Hogetvedt*, 623 N.W.2d at 914).

---

[6] While nonprecedential, and therefore not binding, we find this case helpful as persuasive authority. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).

[7] We ultimately concluded that the error in *Yual* was not reversible error, but that conclusion was based on our determination that the improper testimony did not affect the outcome at trial. 2008 WL 2492293, at *4.

Because the lead detective opined that Williams shot B.B., and we have previously determined that such testimony is improper, we conclude that it was plain error for the district court to admit such testimony in this case.

### C.    Opinion Testimony—Security-Camera Videos

We next address Williams's challenge to testimony from the detectives regarding security-camera videos admitted at trial.  Specifically, Williams argues the district court erred when it allowed detectives to testify that (1) the person depicted in the security-camera video from Williams's apartment building was the same person who appears in the gas-station security-camera video taken several hours before the shooting and (2) the person depicted in both videos was Williams.  Williams asserts that he objected to some of this testimony.  But we agree with the state that Williams failed to preserve an improper-opinion objection to the challenged testimony.  Therefore, we review this issue for plain error.

Minnesota Rule of Evidence 701 allows a lay witness to testify as to opinions and inferences which are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Here, Williams concedes that there are no precedential Minnesota decisions concluding that law-enforcement testimony identifying an individual in a security-camera video is unhelpful to the jury under rule 701.[8]   Moreover, we have repeatedly concluded in nonbinding,

---

[8] Williams relies on *State v. Ali*, 855 N.W.2d 235 (Minn. 2014), in which the district court allowed police officers to testify about identifying the defendant in a security-camera video during the course of their investigation but did not allow them to testify about their current opinion that the defendant was depicted in the video.  But because that case did not directly

nonprecedential decisions that a district court did not err when it allowed law enforcement to testify about the content of videos. *See State v. Kasim*, No. A18-1322, 2019 WL 2415974, at *4-6 (Minn. App. June 10, 2019) (concluding that a police investigator's "testimony was admissible lay-opinion testimony because it was rationally based on his perception and helped the jury to understand his investigation"); *State v. Armstrong*, No. A15-0924, 2016 WL 1551619, at *5 (Minn. App. Apr. 18, 2016) ("The record supports a conclusion that the investigator had personal knowledge relevant to the content of the surveillance video and that the testimony was helpful to the jury."), *rev. denied* (Minn. June 29, 2016); *State v. Clement*, No. A14-1646, 2015 WL 4393559, at *5 (Minn. App. July 20, 2015) (concluding "the officer's testimony here was rationally based on his perception of the video, and was helpful to the jury's clear understanding of his testimony regarding the investigation and the decision to charge appellant"), *rev. denied* (Minn. Oct. 20, 2015).

Under plain-error review, Williams must establish that an error occurred and that the error was plain. *See Pulczinski*, 972 N.W.2d at 356. Because Williams admits there is no caselaw conclusively resolving the issue he presents, we cannot conclude the district court "contravene[d] case law, a rule, or a standard of conduct" when it permitted the detectives' testimony regarding the security-camera videos. *Zinski*, 927 N.W.2d at 275 (quoting *Hayes*, 831 N.W.2d at 555). Therefore, Williams has failed to show the district court plainly erred.

---

address the issue presented here, we cannot say that it forms an appropriate basis for concluding a plain error occurred in this case.

### D.     Privileged Medical Information

We finally address Williams's contention that the district court erred when it allowed B.B.'s surgeon to testify about privileged medical information. Williams argues the admission of the medical information directly contravened Minn. Stat. § 595.02, subd. 1(d) (2022), which prohibits, in relevant part, a surgeon from disclosing any information or opinion they acquired while attending a patient in a professional capacity, unless they have the consent of the patient. Because Williams did not object to the state admitting this evidence, we review this issue for plain error. *See Tscheu*, 758 N.W.2d at 863.

The record contains no information, one way or the other, regarding B.B.'s consent to the surgeon's testimony. And as the state observes, it is possible that B.B. consented to the parties receiving his medical records, which would explain how the parties obtained them. As the appellant, it is Williams's burden to demonstrate that plain error occurred and provide a sufficient record upon which we can make that determination. *See Pulczinski*, 972 N.W.2d at 356 ("Under the plain-error doctrine, a *defendant* must establish (1) an error, (2) that is plain, . . . ." (emphasis added)). Given the possibility that B.B. consented to the surgeon's disclosure of his privileged medical information, Williams failed to demonstrate that the district court erred, much less plainly erred, when it allowed B.B.'s surgeon to testify regarding B.B.'s injuries.

## II.

As set forth above, we conclude three evidentiary errors occurred during Williams's trial: the district court abused its discretion when it concluded the statement made minutes

after the shooting was not an excited utterance; plainly erred when it allowed the detective to testify that B.B. identified the shooter in the photograph in contravention of the Confrontation Clause; and plainly erred when it allowed improper opinion testimony when the lead detective testified that, in his opinion, Williams was the shooter. Having identified the errors, we now address whether those errors require reversal.

We assume, without deciding, that excluding the statement made minutes after the shooting was harmless beyond a reasonable doubt, B.B.'s statement identifying the shooter did not affect Williams' substantial rights, and the lead detective's opinion testimony did not affect Williams' substantial rights. *See State v. Keaton,* 589 N.W.2d 85, 91 (Minn. 1998) (declining to determine whether an error standing alone would warrant a new trial because the "errors, taken cumulatively, deprived the appellant of his right to a fair trial"); *see also Zumberge*, 888 N.W.2d at 694 (harmless beyond a reasonable doubt standard); *Tscheu*, 758 N.W.2d at 863 (impact on substantial rights standard). Instead, we review whether these "errors, when taken cumulatively, ha[d] the effect of denying [the] appellant a fair trial." *State v. Fraga*, 898 N.W.2d 263, 278 (Minn. 2017) (alteration in original) (quoting *State v. Yang*, 774 N.W.2d 539, 560 (Minn. 2009)). Cumulative error results in a new trial only in "rare cases" and, when evaluating such a claim, "we look to the egregiousness of the errors and the strength of the State's case." *Id.*

We conclude the identified errors collectively deprived Williams of a fair trial. Here, the state relied heavily on improperly admitted evidence to identify Williams as the shooter. Specifically, the jury should not have heard that B.B. identified the shooter in the photograph—the same photograph where Williams later identified himself. Nor should

the lead detective have been allowed to offer improper opinion testimony that Williams was the shooter. These two errors, taken together, denied Williams a fair trial because the remaining evidence the state relied on to identify Williams as the shooter came in the form of a dark security-camera video. And the improper identification evidence was all the more harmful when considered alongside the district court's erroneous decision to disallow Williams from entering evidence that B.B. identified the shooter as "Joker" at the scene of the shooting, evidence Williams intended to use to support his defense that B.B. identified someone other than Williams as the shooter.

Considering these errors cumulatively, we are convinced that they had the effect of denying Williams a fair trial. We therefore reverse Williams's conviction and remand to the district court for a new trial.

**Reversed and remanded.**